1  SONIA R. CARVALHO (SBN 162700)
   CITY ATTORNEY
2  JOHN M. FUNK (SBN 204605)
   SENIOR ASSISTANT CITY ATTORNEY
3  CITY OF SANTA ANA
   20 CIVIC CENTER PLAZA M-29
4  P.O. BOX 1988
   SANTA ANA, CALIFORNIA  92702
5  TELEPHONE:  (714) 647-5201
   FACSIMILE:   (714) 647-6515
6  EMAIL: jfunk@santa-ana.org

7  Attorneys for Plaintiff, CITY OF SANTA ANA

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                  SOUTHERN DIVISION

12

13  CITY OF SANTA ANA, a charter city          ) Case No:
    and municipal corporation,                 )
14                                             ) **COMPLAINT BY CITY OF SANTA**
                                               ) **ANA [All Writs Act, 28 U.S.C. §**
15          Plaintiff,                          ) **1651(a)]**
                                               )
16      v.                                     )
                                               )
17                                             )
18  DYER 18 LLC, a Delaware limited            )
    limited company, and DOES 1 through        )
19  10 inclusive,                              )
                                               )
20          Defendants.                        )
                                               )
21                                             )
                                               )
22  _____        )

23       This action is brought by the CITY OF SANTA ANA, a charter city and

24  municipal corporation organized and existing under the Constitution and laws of

25  the State of California ("City" or "Plaintiff") against DYER 18 LLC ("Dyer" or

26  "Defendant") and DOES 1-10, inclusive.

27  ///

28  ///

1

**<u>INTRODUCTION</u>**

2      1.     On March 1, 2021, following approval by the Santa Ana City Council,

3   the City entered into a long-term lease agreement with Defendant for the premises

4   at 1815 East Carnegie Avenue in the City of Santa Ana ("Carnegie Property") for

5   the express purpose of operating an emergency homeless shelter ("Lease

6   Agreement").   A copy of the Lease Agreement is attached as Exhibit A and is

7   incorporated by reference.

8      2.     The Carnegie Property consists of a freestanding industrial building

9   of approximately 29,503 square feet, where the City intends to initially operate

10   through a third party an emergency homeless shelter with 200 beds, with expansion

11   plans for up to 100 or more beds ("Shelter"), in order to provide temporary housing

12   and related support services to individuals experiencing homelessness in the City.

13      3.     Not only is the Shelter necessary for humanitarian reasons but it is

14   also required as part of the City's settlement agreement in the related federal case

15   entitled *Orange County Catholic Worker et al. v. Orange County et al.*, United

16   States District Court Case No. 8:18-cv-00155-DOC-JDE ("City Settlement

17   Agreement").  A copy of the City Settlement Agreement is attached as Exhibit B.

18      4.     Under the Lease Agreement, and at the City's cost, Defendant is

19   obligated to construct, furnish, and install within the Carnegie Property all

20   improvements to enable the City to operate the Shelter.

21      5.     A key provision of the Lease Agreement is that the City will have the

22   option to purchase the Carnegie Property beginning in year two of the Agreement.

23      6.     In a cunning ploy to strip the City of the option to purchase the

24   Carnegie Property and coerce the City into giving up this right, Defendant has

25   alleged several breaches of the Lease Agreement by the City, whereby Defendant

26   claims that the purchase option is no longer available to the City and has threatened

27   termination of the Lease Agreement.

28      7.     But as egregiously, Defendant has now either substantially slowed or

stopped work on the Shelter, when it was nearly 90% complete, and for no apparent reason other than retaliation for a pending state court lawsuit by the City against Dyer to enforce the purchase option or a misguided belief that the City has insufficient funds for the project.

8.     Progress on the Shelter, originally scheduled to open in early 2022, now hangs in the balance because of Defendant's actions.

9.     To ensure completion of the Shelter – and compliance with the City Settlement Agreement – the City is seeking injunctive and other relief against Defendant.  This relief is of the utmost importance so that the City may continue to serve the needs of its most vulnerable population and abate homelessness in the City, as directed by this Court in the OC Catholic Worker and other actions it has overseen.

## THE PARTIES

10.     Plaintiff City of Santa Ana is and at all relevant times has been a charter city and municipal corporation organized and existing under the Constitution and laws of the State of California.

11.     Defendant Dyer 18 LLC is and at all relevant times has been a limited liability company formed in the State of Delaware and registered to do business in California.

12.      Plaintiff does not know the true names and capacities, whether individual, corporate, associate, or otherwise, of DOE defendant 1 through DOE defendant 10, inclusive, and therefore sues these parties under fictitious names pursuant to Local Civil Rule 19-1.  Plaintiff will amend this complaint to show their true names and capacities when the same have been ascertained.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction to enforce the City Settlement Agreement. Pursuant to the Court's October 7, 2019 Order re Dismissal and Retention of Jurisdiction, the Court retained jurisdiction over the City Settlement Agreement for

the period of time specified therein, or 3 years from the Agreement's effective date of September 23, 2019.  OCCW Dkt. 357-2 at 3-4; Exhibit B.

14.    This Court also has jurisdiction to award the relief sought herein pursuant to the All Writs Act, which provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a) (emphasis added).  Federal courts have inherent authority under 28 U.S.C. section 1651(a) to "fashion appropriate modes of procedure" necessary to the exercise of the judicial function. *Harris v. Nelson* 394 U.S. 286, 299 (1969).

15.    Venue is proper in this Court under 28 U.S.C. section 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of property that is the subject of the action is situated in this district.

## FACTUAL ALLEGATIONS

### *DYER'S LEGAL OBLIGATION TO BUILD THE SHELTER*

16.    Section 62 of the Lease Agreement obligates Dyer to complete all improvements necessary for the operation of the Shelter, at the City's cost.  In the Lease Agreement, this is described as the "Work."

17.    As stated in Section 62, "[i]t is the intent and agreement of the parties that the Work is comprised of all work (including all hard and soft costs associated with the design and construction of improvements for the Premises, but excluding any costs for furniture, fixtures, Trade Fixtures and other such similar personal property used in connection with the operation of the Shelter) to enable Lessee to furnish and install the Shelter and comprehensive supportive services, which such facility shall contain sleeping areas, restrooms, showers, laundry rooms, kitchen and storage areas, common areas, and offices, and all other ancillary improvements in connection therewith to enable Lessee to operate the Shelter."

18.     The cost of the Work as stated in the Lease Agreement was estimated to be $8,500,000, plus an available contingency of $850,000.

19.     In January 2022, Dyer representatives notified the City that additional funds would be necessary to complete construction.

20.     In January 2022, Dyer presented to the City a document containing updated anticipated costs, which increased the tenant improvement costs by $2,150,743.  For these, Dyer requested to use the contingency funds in the amount of $850,000 and an additional $1,300,743 to complete the project.

21.     Use of the contingency funds was authorized by the City, and to cover the remaining amount, on February 15, 2022, the Santa Ana City Council approved an additional $2,000,000 in spending for the Shelter, $700,000 more than what was necessary.

22.     As a result of the approved increase, the total allowable expenses for the project are currently at least $11,350,000.  Additional monies can be allocated subject to city council approval, as Dyer is aware.

23.     To date, the City of Santa Ana has paid a total of $10,814,088 for tenant improvements, which constitutes all the invoices presented to it for payment of construction costs as of the time of this action.  There are no outstanding invoices for construction costs.

### *DYER SLOWS OR STOPS WORK ON THE SHELTER*

24.     On Thursday, March 17, 2022, after the close of business, Jeremy Ogulnick, Dyer's representative designated in the Lease Agreement "in all matters in connection with the Work," and Geoffrey Ogulnick, who is overseeing the on-site Shelter construction, advised City staff that expenses from subcontractors were higher than expected and that as a result, work had to slow or pause while they investigated this.  The Dyer representatives also conveyed to City staff that they believed there was no money left in the project budget and that all work on the Shelter was to stop.

25.     The Dyer representatives stated that on Friday (the following day), there would only be a light crew of people and that no one would be working over the weekend.

26.     On Friday, March 18, 2022, at approximately 8:15 a.m., City staff arrived at the Carnegie construction site and found almost no one there, in sharp contrast with the ordinary robust level of construction activity.  The front gate was closed.  There were virtually no cars parked in the parking lot and no construction related parking on any of the streets surrounding the site.

27.     City staff was advised by Geoffrey Ogulnick that work had stopped on the site – despite that the City has paid in full to date for all construction costs and that ample funds are available to cover the remaining services.

28.     On Monday morning, March 21, 2022, City staff again visited the site and found that work had stopped.

29.     The Shelter is approximately 90% complete and was scheduled to open in late March or April.

30.     Dyer has substantially slowed down or stopped work despite the availability of all funds to complete the Shelter and the City's demonstrated willingness and ability to pay.

31.     This is a shocking turn of events, and especially at odds with Dyer's public claims of expertise in building homeless shelters in speedy and cost-effective fashion, as touted by the very same Dyer representatives in a recent news story entitled "California Rapid Shelter Model Gets People off the Street. Then what?" https://www.reuters.com/world/us/california-rapid-shelter-model-gets-people-off-streets-then-what-2022-03-16/.  "Then what?" Only the controversy documented here for which Court intervention has become necessary.

### COURT INTERVENTION IS NECESSARY TO SAVE LIVES

32.     Without the Shelter, more than 200 unhoused individuals will lose access to temporary housing and potentially remain unhoused in and around Santa

1    Ana. This is the consequence of Dyer's actions, taken without any legitimate

2    purpose to frustrate one of the central purposes of the City Settlement Agreement.

3         33.    Without court intervention, the Shelter will remain unfinished,

4    resulting in severe hardship to those depending on it.

5         34.    To avoid this and other grave consequences, concurrent with the filing

6    of this action, the City has filed an ex parte application for a temporary restraining

7    order directing Dyer to complete its obligation under the Lease Agreement to

8    construct the Shelter for the City.

9         35    This relief is of the utmost importance so that the City may continue

10   to serve the needs of its most vulnerable population and abate homelessness in the

11   City, as directed by this Court in the OC Catholic Worker and numerous other

12   homeless-related actions it has overseen in Orange County.

13   **FIRST CAUSE OF ACTION**

14   **Writ of Mandamus (All Writs Act)**

15        36.    Plaintiff City of Santa Ana incorporates by reference and realleges

16   Paragraphs 1 through 35 as if fully set forth herein.

17        37.    Pursuant to the All Writs Act, federal courts "may issue all writs

18   necessary or appropriate in aid of their respective jurisdictions and agreeable to the

19   usages and principles of law." 28 U.S.C. § 1651(a). As the United States Supreme

20   Court has explained, the All Writs Act authorizes federal courts "to issue such

21   commands . . . as may be necessary or appropriate to effectuate and prevent the

22   frustration of orders it has previously issued in its exercise of jurisdiction otherwise

23   obtained." *United States v. New York Tel. Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 54

24   L.Ed.2d 376 (1977).

25        38.    This authority extends to orders necessary or appropriate to effectuate

26   and prevent the frustration of a settlement agreement that has been entered by the

27   Court and which the Court has retained jurisdiction to enforce, such as the City

28   Settlement Agreement. *See Sandpiper Vill. Condo. Ass'n., Inc. v. Louisiana-Pac.*

1    *Corp.*, 428 F.3d 831, 841 (9th Cir. 2005) ("[A] provision in the settlement
2    agreement and order that expressly retains jurisdiction in the district court for the
3    purpose of overseeing and enforcing the prior judgment . . . , in conjunction with
4    the All Writs Act, empowers a district court to protect its judgment from a
5    subsequent action that frustrates the purpose of the settlement agreement and
6    order.").

7         39.    The City Settlement Agreement was approved by the Court for the
8    express purpose of ensuring that individuals experiencing homelessness in Santa
9    Ana would have access to shelter beds in a quantity and manner deemed adequate
10   by the Court.

11        40.    The foregoing actions taken by Dyer clearly frustrate this purpose of
12   the City Settlement Agreement, when the City has paid for all the Work completed
13   by Dyer on the Shelter to date and has approved all further funds necessary for
14   completion.

15        41.    The foregoing actions taken by Dyer also serve to exacerbate the
16   County-wide homelessness crisis, of which this Court is well aware.

17        42.    In order to effectuate and prevent frustration of the City Settlement
18   Agreement, Santa Ana respectfully requests that the Court issue an Order directing
19   Dyer to complete its obligation under the Lease Agreement to construct the Shelter
20   for the City.

21   ///
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff City of Santa Ana prays for the following:

1.     An injunction and order directing Dyer to complete its obligation under the Lease Agreement to construct the Shelter for the City;

2.     Attorney's fees as provided for in the Lease Agreement;

3.     Costs of suit; and

4     Such other relief as the Court may deems just and proper.


CITY OF SANTA ANA
Sonia R. Carvalho, City Attorney


Dated: March 21, 2022          By: _____
                                         John M. Funk
                                         Senior Assistant City Attorney
                                         Attorneys for Plaintiff
                                         CITY OF SANTA ANA

# EXHIBIT A

A-2021-028

MAR 0 9 2021





## STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE - NET
### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

1. **Basic Provisions** ("Basic Provisions").

1.1 **Parties.** This Lease ("Lease"), dated for reference purposes only __March 1, 2021__ , is made by and between __DYER 18, LLC__ ("Lessor") and __THE CITY OF SANTA ANA__ ("Lessee"), (collectively the "Parties," or individually a "Party").

1.2 **Premises.** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known as (street address, city, state, zip): __1815 EAST CARNEGIE AVENUE, SANTA ANA, CA 92705__ ("Premises"). The Premises are located in the County of __ORANGE__ , and are generally described as (describe briefly the nature of the property and , if applicable, the "Project," if the property is located within a Project): __AN APPROXIMATE 29,503 SQUARE FOOT FREESTANDING INDUSTRIAL BUILDING__ . (See also Paragraph 2)

1.3 **Term:** __15__ years and __0__ months ("Original Term") commencing __March , 2021__ ("Commencement Date") and ending __January 31, 2036__ ("Expiration Date"). (See also Paragraph 3)

1.4 **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing __N/A__ ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

1.5 **Base Rent:** __$61,666.00__ per month ("Base Rent"), payable on the __1ST__ day of each month commencing __SEE ADDENDUM__ . (See also Paragraph 4)

☐ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph __SEE ADDENDUM__ .

1.6 **Base Rent and Other Monies Paid Upon Execution:**

(a) **Base Rent:** __$61,666.00__ for the period __1ST MONTH RENT__ .

(b) **Security Deposit:** __$200,000.00__ ("Security Deposit"). (See also Paragraph 5)

(c) **Association Fees:** ____ for the period ____ .

(d) **Other:** ____ for ____ .

(e) **Total Due Upon Execution of this Lease:** __$261,666__ .

1.7 **Agreed Use:** __EMERGENCY HOMELESS SHELTER AND ANCILLARY USES__ . (See also Paragraph 6)

1.8 **Insuring Party.** Lessor is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)

1.9 **Real Estate Brokers.** (See also Paragraph 15 and 25)

(a) **Representation:** Each Party acknowledges receiving a Disclosure Regarding Real Estate Agency Relationship, confirms and consents to the following agency relationships in this Lease with the following real estate brokers ("Broker(s)") and/or their agents ("Agent(s)"):

Lessor's Brokerage Firm __N/A__ License No. ____ Is the broker of (check one): ☐ the Lessor; or ☐ both the Lessee and Lessor (dual agent).

Lessor's Agent __N/A__ License No. ____ Is (check one): ☐ the Lessor's Agent (salesperson or broker associate); or ☐ both the Lessee's Agent and the Lessor's Agent (dual agent).

Lessee's Brokerage Firm __N/A__ License No. ____ Is the broker of (check one): ☐ the Lessee; or ☐ both the Lessee and Lessor (dual agent).

Lessee's Agent __N/A__ License No. ____ Is (check one): ☐ the Lessee's Agent (salesperson or broker associate); or ☐ both the Lessee's Agent and the Lessor's Agent (dual agent).

(b) **Payment to Brokers.** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of ____ or ____ % of the total Base Rent) for the brokerage services rendered by the Brokers.

1.10 **Guarantor.** ~~The obligations of the Lessee under this Lease are to be guaranteed by__ N/A__ ("Guarantor"). (See also Paragraph 37)~~

1.11 **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs __51__ through __70__ ;

☐ a plot plan depicting the Premises;

☐ a current set of the Rules and Regulations;

☐ a Work Letter;

☐ other (specify): ____ .

2. **Premises.**

2.1 **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. NOTE: Lessee is advised to verify the actual size prior to executing this Lease.

2.2 ~~**Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date,~~

INITIALS

INITIALS

© 2019 AIR CRE. All Rights Reserved.

STN-27.30, Revised 11-25-2019

Last Edited: 2/25/2021 9:53 AM

Page 1 of 16

that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "Building") shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense. Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premises; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3   Compliance. Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 49), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)   Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)   If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay Interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)   Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

2.4   Acknowledgements. Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5   Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

**3.   Term.**

3.1   Term. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2   Early Possession. Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

3.3   Delay In Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by

INITIALS                                                        INITIALS

© 2019 AIR CRE. All Rights Reserved.
STN-27.30, Revised 11-25-2019

Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4   Lessee Compliance. Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

**4.     Rent.**

4.1   Rent Defined. All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2   Payment. Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

4.3   Association Fees. Intentionally Omitted. ~~In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owner's association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.~~

**5.     Security Deposit.** Lessee shall deposit with Lessor upon   execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease. THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

**6.     Use.**

6.1   Use. Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. ~~Other than guide, signal and seeing-eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles.~~ Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2   Hazardous Substances.

(a)   Reportable Uses Require Consent. The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)   Duty to Inform Lessor. If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or

INITIALS

INITIALS

© 2019 AIR CRE. All Rights Reserved.
STN-27.30, Revised 11-25-2019

about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)   Lessee Remediation.  Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)   Lessee Indemnification.  Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee).  Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.  No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)   Lessor Indemnification.  Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees.  Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)   Investigations and Remediations.  Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment.  Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)   Lessor Termination Option.  If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice.  In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment.  In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available.  If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3   Lessee's Compliance with Applicable Requirements.  ~~Except as otherwise provided in this Lease,~~ Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date.  Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.  Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.  In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor.  In addition, Lessee shall provide Lessor with copies of its business license, certificate of occupancy and/or any similar document within 10 days of the receipt of a written request therefor.

6.4   Inspection; Compliance.  Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease.  The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority.  In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.  In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor.  Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, should the Lessee improperly or unreasonably fail to allow such inspections and/or testing in a timely fashion Lessee shall pay to Lessor a fee in the amount of $500 ~~the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder of the Lease~~.  The Parties agree that such fee ~~increase in Base Rent~~ represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing.  Such fee ~~increase in Base Rent~~ shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

7.   Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.

7.1   Lessee's Obligations.

(a)   In General.  ~~Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation),~~ Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for

INITIALS                                                                  INITIALS

© 2019 AIR CRE.  All Rights Reserved.
STN-27.30, Revised 11-25-2019

Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

(b)   Service Contracts. Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)   Failure to Perform. If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d)   Replacement. Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (i.e. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.

7.2   Lessor's Obligations. Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises.

7.3   Utility Installations; Trade Fixtures; Alterations.

(a)   Definitions. The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the Improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)   Consent. Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)   Liens; Bonds. Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4   Ownership; Removal; Surrender; and Restoration.

(a)   Ownership. Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)   Removal. By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c)   Surrender; Restoration. Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing and the provisions of Paragraph 7.1(a), if the Lessee occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered

INITIALS

© 2019 AIR CRE. All Rights Reserved.
STN-27.30, Revised 11-25-2019

Last Edited: 2/25/2021 9:53 AM

INITIALS

to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) to the level specified in Applicable Requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

**8.   Insurance; Indemnity.**

    8.1   **Payment For Insurance.**  Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term.  Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.
    8.2   **Liability Insurance.**

        (a)   **Carried by Lessee.**  Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000.  Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

        (b)   **Carried by Lessor.**  Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall, to the extent available, not be named as an additional insured therein. The City of Santa Ana, and its officers, employees, agent and representatives, shall to the extent no cost is incurred with respect thereto and to the extent reasonably available to Lessor shall be additional insureds with respect to any general liability or auto liability policy obtained by Lessor, by endorsement, and all such insurance policies shall be primary and non-contributory.  Lessor shall send certificates of such insurance to Lessee to its Risk Management Division, 4th Floor, 20 Civic Center Plaza, Santa Ana 92701.

    8.3   **Property Insurance - Building, Improvements and Rental Value.**

        (a)   **Building and Improvements.**  The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

        (b)   **Rental Value.**  The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

        (c)   **Adjacent Premises.**  If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

    8.4   **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance.**

        (a)   **Property Damage.**  Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations.  Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

        (b)   **Business Interruption.**  Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

        (c)   **Worker's Compensation Insurance.**  Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements.  Such policy shall include a 'Waiver of Subrogation' endorsement. Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

        (d)   **No Representation of Adequate Coverage.**  Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

    8.5   **Insurance Policies.**  Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies.  Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or

**INITIALS**

**INITIALS**

© 2019 AIR CRE.  All Rights Reserved.
STN-27.30, Revised 11-25-2019

certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6 Waiver of Subrogation. Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7 Indemnity. Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, a Breach of the Lease by Lessee and/or the use and/or occupancy of the Premises and/or Project by Lessee and/or by Lessee's employees, contractors or invitees. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8 Exemption of Lessor and its Agents from Liability. Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9 Failure to Provide Insurance. Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance after notice and reasonable opportunity to cure, Lessee shall pay to Lessor a fee of $500, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such fee increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

**9.     Damage or Destruction.**

9.1 Definitions.

(a)   "Premises Partial Damage" shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b)   "Premises Total Destruction" shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c)   "Insured Loss" shall mean damage or destruction to Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)   "Replacement Cost" shall mean the cost to repair or rebuild the Improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)   "Hazardous Substance Condition" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

9.2 Partial Damage - Insured Loss. If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

INITIALS

© 2019 AIR CRE. All Rights Reserved.
STN-27.30, Revised 11-25-2019

9.3   **Partial Damage - Uninsured Loss.**  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4   **Total Destruction.**  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5   **Damage Near End of Term.**  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage.  Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires.  If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6   **Abatement of Rent; Lessee's Remedies.**

(a)   **Abatement.**  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)   **Remedies.**  If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice.  If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7   **Termination; Advance Payments.**  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.   **Real Property Taxes.**

10.1   **Definition.**  As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address.  Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2   **Payment of Taxes.**  In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date.  If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated.  In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent.  Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent.  When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes.  If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary.  Advance payments may be intermingled with other moneys of Lessor and shall not bear interest.  In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

10.3   **Joint Assessment.**  If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4   **Personal Property Taxes.**  Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee.  When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor.  If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.   **Utilities and Services.**  Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon.  If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed.  There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy,  ·  stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

Within fifteen days of Lessor's written request, Lessee agrees to deliver to Lessor such information, documents and/or authorization as Lessor needs in order for

INITIALS   ·

INITIALS

© 2019 AIR CRE.  All Rights Reserved.
STN-27.30, Revised 11-25-2019

Lessor to comply with new or existing Applicable Requirements relating to commercial building energy usage, ratings, and/or the reporting thereof.

11.   Assignment and Subletting.

12.1  Lessor's Consent Required.

(a)   Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b)   Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c)   The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d)   An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e)   Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f)   Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g)   Notwithstanding the foregoing, allowing a de minimis portion of the Premises, i.e. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2  Terms and Conditions Applicable to Assignment and Subletting.

(a)   Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b)   Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c)   Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d)   In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e)   Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f)   Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g)   Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3  Additional Terms and Conditions Applicable to Subletting. The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)   Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b)   In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c)   Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d)   No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)   Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.  Default; Breach; Remedies.

13.1  Default; Breach. A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

INITIALS

INITIALS

© 2019 AIR CRE. All Rights Reserved.
STN-27.30, Revised 11-25-2019

Last Edited: 2/25/2021 9:53 AM

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee. In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2 Remedies. If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any Indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3 Inducement Recapture. Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by

INITIALS

© 2019 AIR CRE. All Rights Reserved.
STN-27.30, Revised 11-25-2019

Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4  **Late Charges.**  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater.  The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. ~~In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.~~

13.5  **Interest.**  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the 31st day after it was due.  The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law.  Interest is payable in addition to the potential late charge provided for in Paragraph 13.4,    ʼ

13.6  **Breach by Lessor.**

(a)  **Notice of Breach.**  Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor.  For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished to Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b)  **Performance by Lessee on Behalf of Lessor.**  In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset.  Lessee shall document the cost of said cure and supply said documentation to Lessor.

**14.  Condemnation.**  If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs.  If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession.  If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation.  Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph.  All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor.  In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

~~**15.  Brokerage Fees.**~~

~~15.1  Additional Commission.  In addition to the payments owed pursuant to Paragraph 1.9 above, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.  The provisions of this paragraph are intended to supersede the provisions of any earlier agreement to the contrary.~~

~~15.2  Assumption of Obligations.  Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third-party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31.  If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest.  In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent.  In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.~~

~~15.3  Representations and Indemnities of Broker Relationships.  Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker, agent or finder (other than the Brokers and Agents, if any) in connection with this Lease, and that no one other than said named Brokers and Agents is entitled to any commission or finder's fee in connection herewith.  Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.~~

**16.  Estoppel Certificates.**

(a)  Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published BY AIR CRE, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b)  If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.  In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, should the

INITIALS

© 2019 AIR CRE.  All Rights Reserved.
STN-27.30, Revised 11-25-2019

Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion, Lessee shall pay to Lessor a fee of $500 the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c)   If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17.   Definition of Lessor.** The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

**18.   Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19.   Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

**20.   Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

**21.   Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22.   No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

~~23.   Notices.~~
~~23.1  Notice Requirements. All notices required or permitted by this Lease or applicable law may be delivered in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.~~

~~23.2  Date of Notice. Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.~~

~~23.3  Options. Notwithstanding the foregoing, in order to exercise any Options (see paragraph 39), the Notice must be sent by Certified Mail (return receipt requested), Express Mail (signature required), courier (signature required) or some other methodology that provides a receipt establishing the date the notice was received by the Lessor.~~

**24.   Waivers.**
(a)   No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b)   The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)   THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

~~25.   Disclosures Regarding The Nature of a Real Estate Agency Relationship.~~
~~(a)   When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:~~
~~(i)   Lessor's Agent. A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. To the Lessee and the Lessor: (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.~~

INITIALS

INITIALS

© 2019 AIR CRE. All Rights Reserved.
STN-27.30, Revised 11-25-2019

Last Edited: 2/25/2021 9:53 AM
Page 12 of 16

(ii)   Lessee's Agent.  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor.  An agent acting only for a Lessee has the following affirmative obligations.  To the Lessee:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  To the Lessee and the Lessor:  (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)   Agent Representing Both Lessor and Lessee.  A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee.  In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee:  (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee.  (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii).  In representing both Lessor and Lessee, the agent may not, without the express permission of the respective Party, disclose to the other Party confidential information, including, but not limited to, facts relating to either Lessee's or Lessor's financial position, motivations, bargaining position, or other personal information that may impact rent, including Lessor's willingness to accept a rent less than the listing rent or Lessee's willingness to pay rent greater than the rent offered.  The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests.  Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.  Both Lessor and Lessee should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

(b)   Brokers have no responsibility with respect to any default or breach hereof by either Party.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)   Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**26.**   **No Right To Holdover.**  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination.  Holdover Base Rent shall be calculated on monthly basis.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

**27.**   **Cumulative Remedies.**  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

**28.**   **Covenants and Conditions; Construction of Agreement.**  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**29.**   **Binding Effect; Choice of Law.**  This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.  Litigation to this Lease accomplished by means of electronic signature or similar technology shall be legal and binding.

**30.**   **Subordination; Attornment; Non-Disturbance.**

30.1  **Subordination.**  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof.  Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease.  Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2  **Attornment.**  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3  **Non-Disturbance.**  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises.  Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises.  In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4  **Self-Executing.**  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

**31.**   **Attorneys' Fees.**  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees.  Such fees may

INITIALS

INITIALS

© 2019 AIR CRE.  All Rights Reserved.
STN-27.30, Revised 11-25-2019

be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach (§200 is a reasonable minimum per occurrence for such services and consultation).

32.  Lessor's Access; Showing Premises; Repairs.  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33.  Auctions.  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.  Signs.  Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.  Termination; Merger.  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.  Consents.  All requests for consent shall be in writing. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.  Guarantor.
37.1  Execution.  The Guarantors, if any, shall each execute a guaranty in the form most recently published BY AIR CRE, and each such Guarantor shall have the same obligations as Lessee under this Lease.
37.2  Default.  It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.  Quiet Possession.  Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.  Options.  If Lessee is granted any Option, as defined below, then the following provisions shall apply.
39.1  Definition.  "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.
39.2  Options Personal To Original Lessee.  Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.
39.3  Multiple Options.  In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.
39.4  Effect of Default on Options.
(a)  Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.
(b)  The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).
(c)  An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

40.  Multiple Buildings.  If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

INITIALS

© 2019 AIR CRE.  All Rights Reserved.
STN-27.30, Revised 11-25-2019

INITIALS

41.  **Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.  **Reservations.** Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.  **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

44.  **Authority; Multiple Parties; Execution.**
       (a)   If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.
       (b)   If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.
       (c)   This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45.  **Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46.  **Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.  **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.  **Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49.  **Arbitration of Disputes.** An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ is not attached to this Lease.

50.  **Accessibility; Americans with Disabilities Act.**
       (a)   The Premises:

☑ have not undergone an inspection by a Certified Access Specialist (CASp). Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction related accessibility standards.

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

       (b)   Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX

INITIALS                                                INITIALS

© 2019 AIR CRE. All Rights Reserved.
STN-27.30, Revised 11-25-2019

CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:
1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING: IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: _____ | Executed at: _____ |
| On: ____ | On: _____ |
| By LESSOR: | By LESSEE: |
| DYER 88, MA | THE CITY OF SANTA ANA |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: _____ | Title: ____ |
| Phone: _____ | Phone: _____ |
| Fax: _____ | Fax: ____ |
| Email: _____ | Email: _____ |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: ____ | Title: ____ |
| Phone: _____ | Phone: ____    **See attached City of Santa Ana** |
| Fax: ____ | Fax: ____              **signature page** |
| Email: ____ | Email: _____ |
| Address: _____ | Address: _____ |
| Federal ID No.: ____ | Federal ID No.: _____ |
| BROKER | BROKER |
| N/A | N/A |
| Attn: N/A | Attn: N/A |
| Title: _____ | Title: _____ |
| Address: _____ | Address: _____ |
| Phone: _____ | Phone: ____ |
| Fax: ____ | Fax: ____ |
| Email: _____ | Email: ____ |
| Federal ID No.: _____ | Federal ID No.: _____ |
| Broker DRE License #: _____ | Broker DRE License #: _____ |
| Agent DRE License #: _____ | Agent DRE License #: _____ |

AIR CRE * https://www.aircre.com * 213-687-8777 * contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

INITIALS
© 2019 AIR CRE. All Rights Reserved.
STN-27.30, Revised 11-25-2019


INITIALS

Last Edited: 2/25/2021 9:53 AM
Page 16 of 16

A-2021-028

Lessee City of Santa Ana Signature Page to:

Addendum to
Standard Industrial/Commercial Single-Tenant Lease – Net
For Certain Premises Commonly Known as
1815 East Carnegie, Santa Ana, California 92705
March 1, 2021

**CITY OF SANTA ANA:**                                   **ATTEST:**

_____                                  _____
Kristine Ridge                                            Daisy Gomez
City Manager                                              Clerk of the Council

**APPROVED AS TO FORM:**                                 **RECOMMENDED FOR APPROVAL:**
Sonia R. Carvalho
City Attorney

_____                                  _____
Ryan O. Hodge                                             Steven Mendoza
Assistant City Attorney                                   Executive Director
                                                          Community Development Agency

**ADDENDUM TO**
**STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE-NET**
**FOR CERTAIN PREMISES COMMONLY KNOWN AS**
**1815 EAST CARNEGIE, SANTA ANA, CALIFORNIA 92705**
**MARCH 1, 2021**

This Addendum (this "Addendum") is being executed concurrently with and is made a part of that certain lease titled "Standard Industrial/Commercial Single-Tenant-Net" dated March 1, 2021 (the "Form Lease") by and between Dyer 18, LLC ("Lessor") and The City of Santa Ana ("Lessee" and sometimes herein the "City") and this Addendum shall control in the event of any inconsistency with the provisions of such Form Lease. The Section and Paragraph Numbers of this Addendum are new added Sections and Paragraphs to the Form Lease. As used herein, the "Lease" shall mean the Form Lease as supplemented and amended by this Addendum. Unless otherwise defined in this Addendum, any defined word contained in this Addendum has the same meaning as it is defined in the Form Lease.

51.   Intentionally Omitted.

52.   Rent Commencement. Notwithstanding anything to the contrary set forth in this Lease, Base Rent shall commence, and the first monthly payment of Base Rent shall be paid, on the Commencement Date.   If the Commencement Date is not the first day of a calendar month, then such first monthly payment of Base Rent shall be in an amount equal to the aggregate of a prorated Base Rent payment (based on a 30 day month) from such day to the end of that calendar month plus the amount of the full Base Rent payment for the next consecutive calendar month.

53.   Rent Adjustments. On July 1, 2021 ("First Rent Adjustment Date"), the monthly Base Rent payable under this Lease shall automatically increase by 3.0% from the monthly Base Rent amount due and payable during the immediately preceding year.  Thereafter, on each anniversary of the First Rent Adjustment Date (each being a "Subsequent Rent Adjustment Date") during the Term hereof, the monthly Base Rent payable under this Lease shall further automatically increase by 3.0% from the monthly Base Rent amount due and payable during the immediately preceding year from the then last immediately preceding Subsequent Rent Adjustment Date.

54.   Lessee's Improvements. Notwithstanding anything to the contrary set forth in this Lease, all Utility Installations, Trade Fixtures and Alterations, including Lessee Owned Alterations and/or Utility Installations, shall be free and clear of any and all liens and/or encumbrances in favor of any third-party and shall be available, without limitation, to secure Lessee's faithful performance of its obligations as set forth in this Lease.  Upon any default or breach of this Lease by Lessee whereby Lessor elects to terminate the Lease, such Utility Installations, Trade Fixtures and Alterations, including Lessee Owned Alterations and/or Utility Installations, shall remain upon and be surrendered by Lessee to Lessor with the Premises, subject to Lessee's right to remove the same, at Lessee's sole cost and expense, as set forth below.  The Premises shall otherwise be returned to Lessor in the same condition as of the date of this Lease, reasonable wear and tear excepted.  After the Commencement Date, and thereafter from time to time at the reasonable request of Lessor, Lessee hereby agrees to execute certain security instruments, including, but not limited to, a UCC Form-1 or other filing, in order to create and/or perfect Lessor's security interest in such Utility Installations, Trade Fixtures and Alterations, as set forth herein, which security instruments will be prepared by Lessor and submitted to Lessee, and recorded by Lessor, at Lessor's sole cost and expense.  Upon any termination or earlier expiration of this Lease not resulting from the default or breach of this Lease by Lessee, all Utility Installations, Trade Fixtures and Alterations, including Lessee Owned Alterations and/or Utility Installations, located in the Premises shall remain upon and be surrendered by Lessee with the Premises, subject to

Lessee's right to remove the same, at Lessee's sole cost and expenses, as set forth below. The Premises shall otherwise be returned to Lessor in the same condition as of the date of this Lease, reasonable wear and tear excepted. Notwithstanding the foregoing, upon any termination or expiration of this Lease not resulting from the default or breach of this Lease by Lessee, Lessee, at Lessee's option, shall have the right to remove any such Utility Installations, Trade Fixtures and Alterations, including Lessee Owned Alterations and/or Utility Installations, at Lessee's sole cost and expense, provided that (a) all such Utility Installations, Trade Fixtures and Alterations, including Lessee Owned Alterations and/or Utility Installations shall be removed by Lessee within 15 days after such termination or expiration of this Lease and (b) Lessee shall, at its sole cost and expense, repair any damage to the Premises caused by such removal.

55.     Lessor's Obligations.  Notwithstanding anything to the contrary set forth in the Lease, Lessor shall not be required to (a) remediate or rectify any future non-compliance with governmental regulations or (b) provide ADA upgrades to the Premises or the Project resulting from the specific and unique use of the Premises (including without limitation, the Shelter) by Lessee or resulting from any Utility Installations, Trade Fixtures and Alterations, including Lessee Owned Alterations and/or Utility Installations, or other alternations or improvements to the Premises, made by Lessee or Lessor, unless such remediation or upgrades are required as part of the "Work" as set forth in Section 62 herein below prior to occupancy of the Premises and to the extent required to permit Lessee's occupation and use of the Premises and then, such costs shall be included as part of the "Cost of the Work" as set forth in said Section 62 below. Except as otherwise specifically set forth in this Section 55 below, Lessor shall not be required to make or incur any capital expenditures or commence or complete any remediation of Hazardous Substances or any non-compliance with governmental regulations now in effect; provided, however, the foregoing is not intended to and shall not impose upon Lessee or Lessor any obligation to remediate any Hazardous Substances located on the Premises as of the date hereof unless such remediation is required with any work, improvements or Alterations made or being made by or on behalf of Lessee or Lessor to the Premises prior to occupancy of the Premises to the extent required to permit Lessee's occupation and use of the Premises and then, such costs shall be included as part of the "Cost of the Work" as set forth in said Section 62 below. Furthermore, notwithstanding anything to the contrary set forth in the Lease, it is the intent of Lessor and Lessee that Lessor shall have no responsibility or obligation whatsoever, for the maintenance, repair or replacement of all or any portion of the Premises, Building, or Project, including, without limitation, the roof and the HVAC system, such responsibility and obligations being that of Lessee. Lessee shall properly use, operate and safeguard the Premises, including, if applicable, any landscaping, furniture, furnishing and appliances, and all mechanical, electrical, boilers, refrigeration equipment, gas and plumbing fixtures, HVAC and other building systems, and smoke detectors and fire alarms, and keep them and the Premises clean, sanitary and well ventilated and all drains free from blockages or stoppages. Lessee shall be responsible to pay for all utilities, sewer charges and any roof repairs caused by Lessee's use or misuse of the roof or otherwise. Lessee shall properly insure all of the Premises and all of Lessee's and its guests', patients' and invitees' personal property. Notwithstanding anything to the contrary set forth in this Lease, Lessee is solely responsible for any and all upgrades to the existing HVAC system (including, without limitation repair, replacement or additions) and any current repairs or replacements of the roof to accommodate and permit Lessee's use of the Premises as a Shelter and its required occupancy and usage of the Premises, all of which shall be completed prior to Lessee's opening of the Shelter at the Premises, at Lessee's sole cost and expense and then, such costs shall be included as part of the "Cost of the Work" as set forth in said Section 62 below; provided, further, Lessee hereby affirms and agrees that (a) the current HVAC system in the Premises is acceptable to Lessee in its current condition, (b) the roof is acceptable to Lessee in its current condition, and (c) the current structural portions of the Premises are acceptable to Lessee

2

in their current condition  Nothing in this Section 55 shall be deemed or construed as modifying or amending Lessee's obligations for the regular and timely maintenance and repair of the Premises, roof and HVAC system.

56.    Neighborhood Conditions.  Lessee represents and warrants to Lessor that it is aware of neighborhood or area conditions, including schools, proximity and adequacy of law enforcement, crime statistics, proximity of registered felons or offenders, fire protection, other governmental services, availability adequacy and cost of an speed-wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazard or circumstance, cemeteries, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Lessee.

57.    Condition of Premises.  Notwithstanding anything to the contrary in the Lease, Lessor shall deliver the Premises in its current "as is" condition as of the date hereof, and Lessee shall, and does hereby, accept delivery of the Premises as of the date hereof ("Delivery Date", "Effective Date" or "Commencement Date").  Lessee shall provide Lessor a copy of Lessee's certificate(s) of liability insurance concurrently with the execution hereof; provided, however, the failure to do so shall not extend the Delivery Date.  The Premises are hereby leased to Lessee "as is", without representation or warranty by the Lessor (except as otherwise expressly provided in this Lease), and Lessee hereby accepts the Premises in the condition thereof existing as of the date hereof subject to all applicable zoning, municipal, county, state and federal laws, ordinances, rules, regulations, orders, restrictions of record and requirements now or hereafter in effect during the Term (collectively, "Applicable Requirements", "Applicable Laws" or just "Laws").  Therefore, notwithstanding anything to the contrary set forth in this Lease, Lessee represents and warrants that Lessee has inspected the Premises, and that Lessee is familiar with the general and specific condition(s) of the Premises and that Lessor shall have no responsibility or liability (except as otherwise expressly provided in this Lease) with respect to the general or any specific condition of the Premises or any system (including, without limitation, HVAC, electrical, plumbing, refrigeration and fire sprinkler) and that Lessee represents and warrants that, except as expressly set forth herein, Lessee is acting, and will act only, upon information known to, or obtained by, Lessee directly from Lessee's own knowledge and inspection of the Premises (except as otherwise expressly provided in this Lease). Except as otherwise expressly provided in this Lease, Lessor hereby makes no claims, representations or warranties as to the suitability or lack of suitability of the Premises for any proposed or intended use, or availability or lack of availability of (a) permits or approvals of governmental or regulatory authorities, or (b) easements, licenses or other rights with respect to any such proposed or intended use of the Premises or (c) any condition of the Premises, and the availability or lack of availability shall not affect the rights or obligations of the Lessee hereunder.  Therefore: AS A MATERIAL PART OF THE CONSIDERATION FOR THIS LEASE AND THE AMOUNT OF RENT TO BE PAYABLE HEREUNDER, LESSEE AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, LESSEE LEASES AND ACCEPTS THE PREMISES ON AN "AS IS" AND "WHERE IS" BASIS, WITH ALL FAULTS.  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, NO WARRANTY, REPRESENTATION OR GUARANTEE OF ANY TYPE (EXPRESSED, IMPLIED OR STATUTORY, WRITTEN OR ORAL) HAS OR IS MADE BY LESSOR WITH RESPECT TO THE PREMISES, INCLUDING, WITHOUT LIMITATION, AS TO ANY OF THE FOLLOWING: (I) FITNESS FOR ANY PARTICULAR PURPOSE, (II) MERCHANTABILITY, (III) CONDITION OR WORKMANSHIP, (IV) ABSENCE OF DEFECTS OR FAULTS, (V) PRESENCE OR

12926447.1

ABSENCE OF HAZARDOUS OR TOXIC SUBSTANCES, (VI) OPERATION OR PERFORMANCE OF THE PREMISES OR SYSTEMS THEREIN OR THE HABITABILITY OF THE PREMISES, (VII) COMPLIANCE WITH LAWS, ORDINANCES, RULES OR REGULATIONS (FEDERAL, SATE OR LOCAL) and, INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO HEALTH, SAFETY, AND THE ENVIRONMENT, AS THEY MAY APPLY TO THE CURRENT CONDITION OF THE PREMISES OR LESSEE'S INTENDED USE OR (VIII) ANY GOVERNMENT LIMITATION OR RESTRICTION, OR ABSENCE THEREOF, PERTAINING TO THE PREMISES.  LESSEE ACKNOWLEDGES THAT LESSEE HAS ENTERED INTO THIS LEASE RELYING UPON ITS OWN INVESTIGATION OF THE PHYSICAL, ENVIRONMENTAL AND COMPLIANCE CONDITION OF THE PREMISES AND THAT LESSEE IS NOT NOW RELYING, AND WILL NOT LATER RELY, UPON ANY REPRESENTATIONS AND WARRANTIES MADE BY LESSOR OR ANYONE ACTING OR CLAIMING TO ACT, BY, THROUGH OR UNDER OR ON LESSOR'S BEHALF CONCERNING THE PREMISES.  Lessee is familiar with the Premises and their suitability for Lessee's intended use.  All documents which have been given to Lessee by Leasor have been delivered as an accommodation to Lessee and without any representation or warranty as to the sufficiency, accuracy, completeness, validity, truthfulness, enforceability, or assignability of any of the documents, all of which Lessee relies on at its own risk.

58.     Release.  Lessee shall rely solely upon Lessee's own knowledge of the Premises based on its investigation of the Premises and its own inspection of the Premises in determining the Premises' physical condition.  Lessee and anyone claiming by, through or under Lessee hereby waives its right to recover from and fully and irrevocably releases Lessor and its respective members, employees, officers, directors, partners, shareholders, beneficiaries, trustees, fiduciaries, representatives, agents, servants, attorneys, affiliates, parent, subsidiaries, successors and assigns, and all persons, firms, corporations and organizations acting in their behalf ("Released Parties") from any and all claims that it may now have or hereafter acquire against any of the Released Parties for any costs, loss, liability, damage, expenses, demand, action or cause of action arising from or related to any construction defects, errors, omissions or other conditions, latent or otherwise, including environmental matters, affecting the Premises or any portion thereof.  This release includes claims of which Lessee is presently unaware or which Lessee does not presently suspect to exist which, if known by Lessee, would materially affect Lessee's release to Lessor.  In this connection and to the fullest extent permitted by law, Lessee hereby agrees, represents and warrants that Lessee realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Lessee further agrees, represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that, as a material portion of the consideration given to Lessor by Lessee in exchange for Lessor's performance hereunder, Lessee nevertheless hereby intends to release, discharge and acquit Lessor from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included.  Lessor has given Lessee material concessions regarding this transaction in exchange for Lessee agreeing to the provisions of this Paragraph.  The releases set forth above are full and complete releases of all the persons and entities described above of and from any and all liability of any nature whatsoever for all damage, injury, loss, expense, including any consequential expense, loss or damage, whether the same are now known or unknown to the parties, expected or unexpected by said parties, and all rights under Section 1542 of the *California Civil Code* are hereby waived and relinquished.  Section 1542 of the *Civil Code* provides as follows:

4

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

Lessee's Initials

Notwithstanding anything to the contrary herein, the foregoing release in this Section 58 is not intended to and does not cover (i) any claims arising from a breach by Lessor of any Lessor's obligations under this Lease, or (iii) any gross negligence, willful misconduct or fraud committed by Lessor.

59.   Reservations.  Lessee agrees to consent to Lessor's (i) grant of such easements, rights and dedications that Lessor deems necessary, (ii) recordation of parcel maps and restrictions, and (iii) creation and/or installation of new utility raceways, only if such easements, rights, dedications, maps, restrictions, and utility raceways shall not, in Lessee's reasonable discretion, unreasonably interfere with the use of the Premises by Lessee or otherwise materially negatively impact Lessee's use or occupation of the Premises; and in such event, Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights so long as such documents do not impose any cost or liability on Lessee which is non-de-Minimis.  Lessor further reserves the right to change the name by which the Building or the Project (if any) is called with Lessee's prior written consent which shall not be unreasonably withheld.

60.   Assignment and Subletting.  Lessee shall have no right to, and shall not, assign, sublet or otherwise transfer all or any portion of the Premises or its rights under and to this Lease without the prior written consent of Lessor, which such consent may be given or denied in Lessor's sole and absolute discretion (and which such consent may be conditioned upon Lessee entering into a lease guaranty  ("Lease Guaranty") in favor of Lessor (upon terms and conditions reasonably acceptable to Lessor), whereby Lessee guaranties the performance by such assignee.  Any assignment, subletting or transfer without such consent shall be a non-curable Default and Breach hereunder, without any prior notice need being given.  Notwithstanding the foregoing, Lessee shall have the right to enter into one or more agreements (collectively, with any extension, renewal, amendment or replacement thereof, the "City Agreements") with an established third party operator of similar situated homeless navigation centers as the Shelter ("Third Party Operator), provided, however, that Lessee shall have first provided the name of such proposed Third Party Operator, and the terms of the City Agreements and provided further, that no such City Agreement shall modify or amend Lessee's obligations under this Lease.

61.   Insurance.  Notwithstanding anything to the contrary set forth in the Form Lease, Lessee shall carry and maintain, at its sole cost and expense, the following insurance: (i) Commercial General Liability Insurance (occurrence form) including coverage for death, bodily injury, with coverage for vandalism and malicious mischief, broad form property damage, contractual liability, owner's protective, host liquor liability and products/completed operations with coverage limits as reasonably required by Lessor from time to time, but in no event less than Five Million Dollars ($5,000,000.00), combined each occurrence and in the aggregate insuring against any and all liability of the Lessee with respect to the Premises and all areas appurtenant thereto or arising out

5

of the maintenance, use or occupancy thereof (Lessee may satisfy any portion of this requirement with umbrella liability coverage); (ii) Insurance covering any and all improvements, including Lessee's furniture, fixtures and equipment and any Alterations permitted hereunder, and all personal property, in an amount not less than their full replacement cost providing protection against any peril included within the classification "Special Form" including fire, vandalism and malicious mischief; (iii) Automobile liability insurance for all motor vehicles operated by or for Lessee, including owned, hired and non-owned vehicles, with minimum combined single limit coverage for bodily injury and property damage as reasonably required by Lessor from time to time, but in no event less than One Million Dollars ($1,000,000.00) for each occurrence, (iv) full replacement cost plate glass insurance and business interruption insurance in such amount as will reimburse Lessee for direct or indirect loss of earnings for up to 12 months attributable to all such perils insured against herein or any other cause, (v) Workers' Compensation, including employer's liability insurance, in compliance with all laws governing worker's compensation. If Lessee fails to maintain such insurance, Lessee shall be deemed to have assumed the risk of all losses which would have been covered by such insurance and Lessor shall have no liability for any such losses. All of Lessee's policies of insurance shall be issued by insurance companies with general policyholder's rating of not less than A and a financial rating of not less than Class A VI as rated in the most current available "Best's" Insurance Reports and qualified to do business in the State of California. All policies shall name Lessor, its related or affiliated entities, parents, subsidiaries, partnerships, joint ventures, limited liability companies, members, trusts and assigns of every tier (as identified by Lessor), and each of their respective directors, officers, partners, agents, employees, volunteers, members, managers, trustees, shareholders and any successors or assigns of the foregoing, as well as Lessor's management company and if requested by Lessor, Lessor's first mortgagee or beneficiary as additional insureds (to the extent Lessor gives written notice to Lessee of the names and addresses of such parties). Certificates for all policies shall be delivered to Lessor prior to delivery of possession of the Premises to Lessee, and thereafter within thirty (30) days prior to the expiration of the term of each such policy. Until Lessee has delivered to Lessor such certificates of insurance, Lessor shall not be obligated to deliver keys to the Premises to Lessee, and Lessee shall not be entitled to take occupancy of the Premises notwithstanding the fact the Term of the Lease and Lessee's obligation to pay rent hereunder may have already commenced. All policies of insurance must contain a provision that Lessor will receive thirty (30) days' advanced written notice of any cancellation, lapse or reduction in the amounts of insurance. All public liability, property damage and other casualty policies shall be written as primary policies, not contributing with or in excess of coverage which Lessor may carry. All of Lessee's insurance policies shall contain the following provisions: severability of interest, cross liability, and contingent liability and builder's risk, with respect to improvements and alterations required or permitted to be made by Lessee under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee hereunder. If Lessee fails to maintain or procure such insurance, Lessor shall have the right, but not the obligation, to procure and maintain the same, at Lessee's sole cost and expense. Lessee and Lessor each hereby waive any and all rights of recovery against the other, or against the officers, employees, agents and representatives of the other, for loss of or damage to such waiving party or its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy required to be carried under this Lease. Each party shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Lease, and shall obtain any special endorsements required at the insuring party's cost, if any. The parties agree in the event of any damage to Lessee, the Premises, Lessee's property, and/or any loss to Lessee's employees or invitees each shall resort to insurance coverage prior to asserting any claim or demand against the other or its assets. Nothing in this Section shall be deemed to constitute a waiver by the

6

respective insurance carriers of either Lessee or Lessor of any other remedies available to said carriers

62.     Initial Improvements and Work. Lessor, through the "General Contractor" (as defined below), shall construct, furnish and install within the Premises, including outside yard area, those items of construction (the "Work") shown on the "Plans" (as defined below). It is the intent and agreement of the parties that the Work is comprised of all work (including all hard and soft costs associated with the design and construction of improvements for the Premises, but excluding any costs for furniture, fixtures, Trade Fixtures and other such similar personal property used in connection with the operation of the Shelter) to enable Lessee to furnish and install the Shelter and comprehensive supportive services, which such facility shall contain sleeping areas, restrooms, showers, laundry rooms, kitchen and storage areas, common areas, and offices, and all other ancillary improvements in connection therewith to enable Lessee to operate the Shelter. The architectural, structural, grading, mechanical, electrical, plumbing, sewer and fire/life safety standards that shall be applicable to the construction required to complete the Work, shall be subject to Lessor's rules and regulations applicable to the performance of the Work (collectively, the **"Work Standards"**). Lessor hereby appoints Jeremy Ogulnick as Lessor's representative (**"Lessor's Representative"**) to act for Lessor in all matters in connection with the Work. Lessee hereby appoints _____ as Lessee's representative(s) (**"Lessee's Representative(s)"**) to act for Lessee in all matters in connection with the Work and Lessee shall be responsible for all costs authorized by Lessee's Representative(s). All inquiries, requests, instructions, authorizations and other communications with respect to the Work shall be made to Lessor's Representative or Lessee's Representative(s), as the case may be. Authorizations made by Lessee's Representative(s) shall be binding on Lessee. Authorizations made by Lessor's Representative shall be binding on Lessor. Either party may change its representatives under this Section 62 at any time by written notice to the other party, but any such change shall be effective only upon receipt by the other party. Notwithstanding the foregoing, in no event shall any direction by Lessor's Representative or Lessee's Representative(s) constitute a change in the terms or conditions of the Lease, unless the Lease is expressly modified in a writing executed by both Lessor and Lessee. All work shall be done pursuant to those architectural, electrical, mechanical, plumbing, life safety and structural drawings and specifications (including all finishes) for the Work, which shall be approved by Lessor and Lessee (collectively, the **"Plans"**). Lessee may not make any material changes, modifications or alterations in the Plans (collectively, **"Lessee Changes"**) at any time without Lessor's prior written approval thereof which shall not be unreasonably withheld, conditioned or delayed and the cost of any such Lessee Changes shall be added to the Cost of the Work and shall not be included in the "Contingency Amount" (as defined below) and in the event of any such approved Lessee Changes, the Cost Estimate shall be increased by the amount of such Lessee Changes. Lessor may from time to time during the prosecution of the Work require reasonable modifications or amendments to the Plans due to unforeseeable conditions or to the extent changes are required to comply with applicable Laws (**"Lessor Changes"**) and the cost of any such Lessor Changes shall be included in the "Contingency Amount" (as defined below), unless it is considered a "Change Order" (as defined below) approved by Lessee. Lessor acknowledges and agrees that Lessor shall be solely responsible for causing the Work to be constructed and maintained, in accordance with all applicable Laws, including, without limitation, the provisions of the American with Disabilities Act, 42 U.S.C. Section 12101 et seq. and any governmental regulations with respect thereto (the "ADA") and other similar Laws. Additionally, to the extent applicable to the Work, Lessor shall be responsible for complying with all pertinent prevailing wage laws pursuant to California Labor Code sections 1720, et seq. Lessee shall pay the entire "Cost of the Work". As used herein, the term **"Cost of the Work"** means all costs and expenses in connection with the design, furnishing, construction and installation of the Work, including without limitation:  (a) all architectural,

engineering and consultant fees associated with the preparation of the Plans; (b) governmental agency plan review, permit, license and other fees (including, without limitation, any charges required by any governmental entity or authority having jurisdiction over the Premises); (c) sales and use taxes; (d) insurance costs and expenses; (e) testing and inspecting costs; (f) costs and expenses of material and labor, including without limitation, General Contractor's profit and general overhead; (g) costs and expenses associated with the compliance with applicable Laws; (h) costs and expenses of alterations of the Premises and all life safety systems necessitated by any applicable Law; (i) costs and expenses associated with any modification or addition to the Premises or any street or public right of way; (j) all costs and expenses of construction work required to complete the Work; (k) costs and expenses of Lessee signage, if any; (l) costs and expenses associated with the placement of any new, additional or supplemental mechanical, electrical, plumbing or life safety systems on the Premises, including, without limitation, costs associated with any repair or replacement of any HVAC units or systems, and running piping and conduit to such systems (the location for such piping and conduit shall be selected by Lessor); (m) costs and expenses associated with any Lessee Changes or Lessor Changes; and (n) any out-of-pocket costs and expenses incurred by Lessor or Lessor's consultants associated with the review of the Plans. Lessor proposed that the entire Cost of Work would be $8, 500,000 for the completion of the Work ("**Cost Estimate**"). Any changes to the scope of Work that would increase the "Cost Estimate" must be approved in writing by Lessee prior to commencement of such extra Work ("**Change Order**") provided, however, that Lessor and Lessee also agree to a 10% contingency amount equal to $850,000 ("Contingency Amount"), which such Contingency Amount may be incurred in connection with any Lessor Change, and is to be paid and reimbursed to Lessor by Lessee, without such prior written approval of Lessee. Concurrently upon the execution of this Lease, Lessee shall deposit with Lessor, the sum of $850,000, which such amount shall be a "retainer" against fees and costs incurred by Lessor in connection with Lessor's completion of the Work. All Work shall be completed by a general contractor chosen by Lessor but approved by Lessee, which approval shall not be unreasonably withheld, conditioned or delayed (the "**General Contractor**"). Lessor shall be required to obtain the required permits for the Work, with any costs and expenses included within the Cost Estimate. Lessee hereby approves Bentley Construction as the General Contractor. Lessee must arrange with an insurance company to provide the coverage required under the Lease, the cost of which is not included in the Cost Estimate. Prior to the start of Work, Lessor must receive the certificates of insurance required under the Lease. Such certificate of insurance shall name Lessor as additional insured. Lessor shall cause the General Contractor to perform all Work in a good and workmanlike manner and in accordance with good industry practice, applicable Laws and the Lessor's Work Standards, and in material compliance with the Plans. Lessor shall deliver to Lessee a request for payment from the General Contractor, approved by Lessor, showing the schedule, by trade, of percentage of completion of the Work and the cost of labor rendered and materials delivered to the Premises for which such payment is being requested, which such request for payment may be submitted weekly and on or before the seventh (7th) Business Day after receipt of such request for payment, Lessee shall deliver a check to Lessor made payable to either Lessor or General Contractor, the amounts so requested by Lessor. During the construction of the Work, Lessor's Representative and Lessee's Representative shall meet as often as deemed reasonably necessary by Lessor and/or Lessee to discuss construction progress. For purposes hereof, "**Substantial Completion**" (and any correlative variations thereof) of the Work shall mean completion of construction of the Work in material compliance with the Plans, with the exception of any Punch List Items. For the purposes hereof, the term "**Punch List Items**" shall mean minor details of construction or decoration or mechanical adjustments that can reasonably be completed after the date Lessee commences its operations within the Premises without causing substantial interference with Lessee's operations at the Premises. Lessor shall use its good faith efforts to

8

correct (or cause General Contractor to correct) all Punch List Items within thirty (30) days after Substantial Completion of the Lessee Work.

63.     Operations/Use. Notwithstanding anything to the contrary set forth in the Form Lease, Lessee agrees that at all times, the Premises (and the navigation center ("Shelter")) shall be operated (a) in complete compliance with the attached Exhibit B, (b) in a first class manner, consistent with the highest quality standards of care, cleanliness and safety for employees, guests, patients, invitees and neighbors, and with proper levels of experienced management and staffing, to enable the provision of appropriate programs and assistance for homeless individuals in the City, and (c) in full compliance with all applicable local, state and federal laws, rules and regulations. Furthermore, Lessee covenants and agrees that it (and any Third Party Operator) shall not discriminate against any person or group of persons on account of race, disability, color, creed, religion, sex, marital status, sexual orientation, national origin, or ancestry, in the use, occupancy, tenure, or enjoyment of the Shelter. Lessee (and any Third Party Operator) shall refrain from restricting the use of the Shelter on the basis of the race, age, disability, color, religion, creed, gender, sex, marital status, sexual orientation, ancestry, or national origin of any person, nor shall Lessee, any Third Party Operator or any person claiming under or through Lessee or any Third Party Operator, establish or permit any such practice or practices of discrimination with reference to the selection, location, number, use, or occupancy of the Shelter. Lessee and any Third Party Operator shall comply with the Occupational Safety and Health Act of 1970, 29 U.S.C. section 651 et seq., and the Americans with Disabilities Act of 1990, 42 U.S.C. section 12101 et seq., and any analogous legislation in California (collectively, "the Acts"), to the extent that the Acts apply to the Shelter and any activities thereon. Without limiting the generality of the foregoing, Lessee covenants to maintain all non-structural portions of the Shelter including working areas, all machinery, electrical facilities and the like upon the site in a condition that fully complies with the requirements of the Acts.

64.     Indemnity. Lessee shall indemnify, protect, defend (with counsel satisfactory to Lessor) and hold harmless Lessor and the Released Parties, from and against any and all claims arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee, any Third Party Operator or any Lessee's or any Third Party Operator's employees, customers, patients, guests, invitees, directors, trustees, fiduciaries, representatives, agents, servants, subsidiaries, successors and assigns, and all persons, firms, corporations and organizations acting in their behalf of the Lessee and any Third Party Operator (collectively, "Lessee Parties") or any act, omission or negligence of any Lessee and/or any of the Lessee Parties or any Default and/or Breach by Lessee of any covenants, terms and/or conditions set forth in this Lease, either prior to, during, or after the expiration of the Term and including any claims brought or arising out of any civil tort or criminal activity; provided however, that the foregoing indemnification shall not apply to the extent arising out of the gross negligence or willful misconduct of Lessor or the Released Parties. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's sole cost and expense by counsel reasonably satisfactory to Lessor and Lessor shall reasonably cooperate with Lessee in such defense. If Lessor in its sole discretion shall determine that it is in Lessor's interest to have separate legal counsel, Lessee shall indemnify Lessor for any legal fees and costs incurred by Lessor for the defense of any such claims. Lessor need not have first paid any such claims in order to be defended or indemnified hereunder.

Lessor shall indemnify, protect, defend (with counsel satisfactory to Lessee) and hold harmless Lessee and the Lessee Parties, from and against any and all claims arising out of, involving, or in connection with, the gross negligence or willful misconduct of Lessor relating to the Premises either prior to, during, or after the expiration of the Term and including any claims brought or

9

arising out of any civil tort or criminal activity; provided however, that the foregoing indemnification shall not apply to the extent arising out of the gross negligence or willful misconduct of Lessee or the Lessee Parties. If any action or proceeding is brought against Lessee by reason of any of the foregoing matters, Lessor shall upon notice defend the same at Lessor's sole cost and expense by counsel reasonably satisfactory to Lessee and Lessee shall reasonably cooperate with Lessor in such defense. If Lessee in its sole discretion shall determine that it is in Lessee's interest to have separate legal counsel, Lessor shall indemnify Lessee for any legal fees and costs incurred by Lessee for the defense of any such claims. Lessee need not have first paid any such claims in order to be defended or indemnified hereunder.

65.   Notices.  Notwithstanding anything to the contrary in the Form Lease, all notices, requests, or demands herein provided to be given or made, or which may be given or made by either party to the other, shall be given or made only in writing and shall be deemed to have been duly given: (i) upon delivery, or if delivery is rejected when delivery was attempted, of U.S. Certified Mail, properly addressed, postage prepaid with return receipt requested; or (ii) upon delivery, or if delivery is rejected when delivery was attempted, when sent via overnight or express mail courier, properly addressed and postage prepaid; (iii) when delivered personally at the address listed below their respective signatures (signature required), or (iv) by e-mail, and if so sent, (a) the subject line of the e-mail shall state "URGENT:  NOTICE TO [LESSEE] [LESSOR]" (or substantially similar thereto) and (b) followed within one (1) business day by a copy sent by a method prescribed in (i), (ii) or (iv) above; provided however, that all deliveries or attempted deliveries shall only be made or attempted to be made on a Business Day.  Notwithstanding the prescribed methods of delivery set forth above, actual receipt of written notice by a party designated below shall constitute notice given in accordance with the Agreement on the date received, unless deemed earlier given pursuant to the foregoing methods of delivery.  The proper address to which notices, requests or demands may be given or made by either party shall be the address set forth for such party as set forth in the Form Lease, or to such other address or to such other person as any party shall designate in writing, such address may be changed by written notice given to the other party in accordance with this Paragraph.

66.   ADA Upgrades.  Except with respect to the Work as set forth in Section 62 above, Lessor shall not be required to provide ADA upgrades to the Premises.

67.   Intentionally Omitted.

68.   Inspections.  Notwithstanding anything to the contrary set forth in the Form Lease, upon reasonable notice to Lessee, Lessor shall have the right to inspect the Premises, or cause the Premises to be inspected by a third party chosen by Lessor, to verify that Premises are at all times being operated in full compliance with the terms of Paragraph 61 of this Addendum and as otherwise required by this Lease.  In the event that any such inspection reveals any such non-compliance, the same shall be, at the option of Lessor, a Default and or Breach by Lessee under the Lease.  As additional consideration for Lessor's entering into this Lease, Lessee shall reimburse and pay to Lessor, in addition to Base Rent and other Rent due hereunder, the cost of any such inspection, up to $500 per inspection but no more than once each calendar month, to help offset the cost of such inspections, such amounts to be paid by Lessee to Lessor within 5 days after Lessee's receipt from Lessor of a copy of the applicable inspection report and invoice therefor, and all such amounts being deemed Rent under this Lease.

69.   Option to Purchase.  Lessor hereby grants to Lessee an option (the "Purchase Option") during the Purchase Option Period (as defined herein below) to purchase the Premises upon the following terms:

10

12926447.1

69.1. Purchase Price. The Purchase Price for the Premises shall be equal to the sum of $9,200,000 (the "Initial Price") plus the Increase Amount (as defined below) (said Initial Price plus the Increase Amount, if any, being the "Purchase Price"), payable in cash at Closing (as defined below); provided, however, that the Initial Price is based in part upon Lessor's original purchase price of the Premises and in the event that Lessor receives any monies back in respect thereof from its seller as set forth in its original purchase agreement, the Initial Price shall be reduced by said amount so received. The "Increase Amount" shall be the amount equal to 50% of the increase in the Consumer Price Index for all Urban Consumers for the Los Angeles-Anaheim-Riverside area, all items published by the United States Department of Labor, Bureau of Labor Statistics (1982-84=100) ("Index") from May 2020 ("Base Index") to the date of the Notice of Exercise (as defined below); such increase to be calculated by taking the Initial Price and multiplying it by a fraction, the numerator being the Base Index, and the denominator being the Index published for the month in which the Notice of Exercise is delivered. If the Index is changed so the Index differs from that used as of the date hereof, the Index shall be converted under the conversion factor published by the United States Department of Labor, Bureau of Labor Statistics. If the Index is discontinued or revised during the Lease Term, such other governmental Index or computation with which it is replaced shall be used to obtain substantially the same results as would be obtained if the Index had not been discontinued or revised. Notwithstanding the foregoing, the Increase Amount shall not increase the Initial Price by an amount equal to more than 1.5% per year (non-compounding). Additionally, in the event Lessor receives funds for the Regulatory Safety Permit, the Purchase Price shall be reduced by $1,000,000 or the amount of such funds that are received by Lessor, provided, however, that any interest collected by Lessor in connection with such Regulatory Safety Permit amount shall not be included in the reduction of such Purchase Price.

69.2. Term of Purchase Option. The term of the Purchase Option shall commence upon the 1st day of the 13th month of the Term of the Lease (the "Purchase Option Commencement Date") and shall expire on the earlier of (a) the five (5) year anniversary of the Commencement Date and (b) the expiration or termination of this Lease for any reason whatsoever (the "Purchase Option Termination Date"). The period between the Purchase Option Commencement Date and the Purchase Option Termination Date shall be referred to herein as the "Purchase Option Period." In the event Lessee fails to timely exercise the Purchase Option within the Purchase Option Period, the Purchase Option, and all rights of Lessee, shall immediately and automatically cease and terminate, and the Purchase Option shall in that event be null and void and be of no further force or effect whatsoever. Lessee may exercise the Purchase Option only in the manner provided in Section 69.4 below.

69.3. Investigations. During the Purchase Option Period, Lessee shall be permitted to investigate the Premises and undertake all actions that it deems necessary or desirable to ascertain the condition of the Premises which includes, but is not limited to, the environmental condition of the Premises, status of title to the Premises, and the condition of the improvements on the Premises. Accordingly, during the Purchase Option Period, Lessee shall have, in addition to its rights as the tenant of the Premises hereunder, and is hereby granted, the right to make and conduct such non-invasive surveys, studies, tests, investigations, and inspections (environmental and otherwise) as Lessee deems reasonably necessary or convenient; provided that Lessee may make such invasive surveys, studies, tests, investigations or inspections as it deems reasonably necessary or convenient only upon the prior written consent of Lessor which shall not be unreasonably

11

withheld. All such surveys, studies, tests, investigations and inspections shall be performed at the sole cost and expense of Lessee and Lessee shall indemnify, defend and hold Lessor harmless from and against any and all cost, expense, liability arising from or in connection with any such surveys, studies, tests, investigation and inspections.

69.4.   Exercise of Purchase Option. To exercise the Purchase Option, Lessee shall serve written notice of exercise upon Lessor or Lessor's legal representatives at any time after the Purchase Option Commencement Date but prior to the Purchase Option Termination Date ("Notice of Exercise"), which such Notice of Exercise shall be accompanied by a cash or cash equivalent in the amount of One Hundred Thousand Dollars ($100,000.00) ("Deposit"). The Deposit shall be invested by Escrow Holder (as defined below) in a federally insured interest-bearing account with any interest accruing thereon to be paid or credited to Lessee. At the Close of Purchase Option Escrow, the Deposit and any accrued interest thereon shall be applied and credited toward payment of the Purchase Price. The Notice of Exercise shall provide at least 90-120 days for Lessor to locate an exchange property prior to the Closing of the Purchase Option Escrow.

69.5.   Escrow. If Lessee timely exercises the Purchase Option by the timely delivery of the Notice of Exercise and the Deposit, Lessor and Lessee shall immediately open an escrow ("Option Escrow") with Chicago Title Company ("Escrow Holder", the specific escrow officer being chosen by Lessor, or Lessor may choose such other escrow or title company in its reasonable discretion upon written notice to Lessee, which such escrow or title company shall be subject to Lessee's approval, which will not be unreasonably withheld, conditioned or delayed), whereupon the Deposit shall be delivered to Escrow Holder. This Agreement shall constitute joint escrow instructions to Escrow Holder with respect to the purchase and sale of the Premises. The parties shall execute such additional escrow instructions which are not inconsistent with the provisions of this Agreement and which may be required by Escrow Holder in order to close such escrow.

69.6.   Payment. The Purchase Price shall be paid in cash upon the Close of Purchase Option Escrow (as defined below).

69.7.   Closing. The close of the Purchase Option Escrow for the purchase and sale of the Premises shall occur on or before the date which is thirty (30) days ("Scheduled Closing Date") after the date of delivery of the Notice of Exercise by Lessee to Lessor (the "Close of Purchase Option Escrow" or "Closing"). For purposes hereof, the Close of Purchase Option Escrow (and Closing) shall be the date on which the Grant Deed conveying the Premises to Lessee is recorded.

a)   If, following Lessee's timely and proper exercise of the Purchase Option, the Closing fails to occur as a result of Lessor's breach or default and if Lessor should remain in default in any material respect in the performance of any of Lessor's obligations under the Lease with respect to the sale of the Premises after the fifth (5th) Business Day following the delivery by Lessee to Lessor of written notice of such default, Lessee shall be entitled, as its sole and exclusive remedy for any such default, to elect any one of the following remedies (so long as title to the Premises has not been further encumbered involuntarily or by or with the consent of Lessor, and Lessor elects not to remove such encumbrance on or prior to Closing): (i) terminate its Purchase Option and receive the return of the Deposit, and, thereafter, the parties shall have no further rights or obligations hereunder except that if applicable, the Lease shall continue thereafter in full

12

force and effect, or for obligations which expressly survive the termination of the Purchase Option; or (ii) bring and pursue an action for specific performance of the Purchase Option; or (iii) waive the default and proceed to close the transaction contemplated herein. As a condition precedent to Lessee exercising any right it may have to bring an action for specific performance hereunder, Lessee must commence such an action within thirty (30) days after the occurrence of Lessor's default. Lessee agrees that its failure to timely commence such an action for specific performance within such thirty (30) day period shall be deemed a waiver by it of its right to commence an action for specific performance as well as a waiver by it of any right it may have to file or record a notice of lis pendens or notice of pendency of action or similar notice against the Premises.

b)     If, following Lessee's timely and proper exercise of the Purchase Option, the Closing fails to occur as a result of Lessee's breach or default, and if Lessee should remain in default in any material respect in the performance of any of Lessee's obligations with respect to the purchase of the Premises after the fifth (5th) Business Day following the delivery by Lessor to Lessee of written notice of such default, THEN AND IN SUCH EVENT, NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, LESSEE AND LESSOR AGREE THAT LESSOR WILL INCUR DAMAGES BY REASON OF SUCH DEFAULT BY LESSEE, WHICH DAMAGES SHALL BE IMPRACTICAL AND EXTREMELY DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN. LESSEE AND LESSOR, IN A REASONABLE EFFORT TO ASCERTAIN WHAT LESSOR'S DAMAGES WOULD BE IN THE EVENT OF SUCH DEFAULT BY LESSEE HAVE AGREED BY PLACING THEIR INITIALS BELOW THAT THE AMOUNT OF THE DEPOSIT SHALL BE DEEMED TO CONSTITUTE A REASONABLE ESTIMATE OF LESSOR'S DAMAGES UNDER THE PROVISIONS OF SECTION 1671 OF THE CALIFORNIA CIVIL CODE AND THE PAYMENT AND RETENTION OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369. IN THE EVENT OF AND FOR SUCH DEFAULT BY LESSEE; LESSOR SHALL RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES AS LESSOR'S SOLE REMEDY THEREFOR, UNLESS LESSEE WRONGFULLY REFUSES TO CAUSE ESCROW HOLDER TO CANCEL THE ESCROW OR TO RELEASE THE DEPOSIT TO LESSOR, IN WHICH INSTANCE LESSOR SHALL ALSO BE ENTITLED TO ALL COSTS AND EXPENSES, INCLUDING ACTUAL ATTORNEYS' FEES INCURRED BY LESSOR WITH RESPECT TO THOSE CONSEQUENTIAL DAMAGES, IF ANY, WHICH MAY BE INCURRED BY LESSOR, AFTER THE CLOSING DATE OR OTHER TERMINATION OF THIS AGREEMENT OR CANCELATION OF THE TRANSACTIONS HEREIN CONTEMPLATED BY REASON OF THE CLOUD ON TITLE TO THE PROPERTY WHICH MAY RESULT FROM LESSEE'S WRONGFUL FAILURE TO CANCEL THE ESCROW AND THIS AGREEMENT. ESCROW HOLDER IS HEREBY INSTRUCTED TO IMMEDIATELY RELEASE THE DEPOSIT TO LESSOR IN THE EVENT OF A BREACH BY LESSEE HEREUNDER. IN ADDITION, IF LESSEE WRONGFULLY FAILS TO CAUSE SUCH SUM TO BE DELIVERED TO LESSOR AS HERETOFORE PROVIDED, INTEREST SHALL ACCRUE THEREON AT THE MAXIMUM RATE ALLOWED BY

13

LAW FROM THE DATE OF LESSOR'S WRITTEN NOTICE OF DEFAULT AND TERMINATION UNTIL PAYMENT THEREOF. IN ADDITION, LESSEE SHALL PAY ALL TITLE AND ESCROW CANCELLATION CHARGES. FURTHERMORE AND NOT WITHSTANDING THE FOREGOING, THIS PARAGRAPH PERTAINS ONLY TO A DEFAULT BY LESSEE WITH RESPECT TO THE PURCHASE OPTION AND SHALL NOT RESTRICT, LIMIT, MODIFY, ALTER OR AMEND, IN ANY MANNER WHATSOEVER, ANY RIGHT OR REMEDY OF LESSOR IN THE EVENT OF A DEFAULT BY LESSEE UNDER THE LEASE.

_____     _____
Lessee's Initials                     Lessor's Initials

(c)     Except as otherwise set forth herein, either party shall not be liable for consequential or speculative damages in connection with such party's breach or default hereunder.

(d)     Additionally, and notwithstanding the foregoing, if following Lessee's timely and proper exercise of its Purchase Option, the Premises suffer a material casualty (which, for purposes hereof shall mean damage with a cost to repair in excess of $100,000 not caused by Lessee or any employee, resident, guest or invitee of Lessee), then Lessee shall have the right to either (i) proceed with the Close of Escrow (in which case, if there were such a material casualty Lessee shall be entitled to receive all available insurance proceeds and receive a reduction of the Purchase Price in an amount equal to the deductible amount and any required co-insurance payment with respect to the insurance, and there shall be no other reduction in the Purchase Price), or (ii) rescind the Notice of Exercise, in which case the Deposit shall be returned to Lessee, the Lease shall continue in full force and effect (including Lessee's right to later re-exercise the Purchase Option), and Lessee shall not be liable for any costs incurred by Lessor with respect to the failed Closing; provided, however that each of Lessee and Lessor shall pay one-half of the Escrow Holder's costs and fees in connection with the Option Escrow and its cancellation.

(e)     Additionally, and notwithstanding the foregoing, if the Closing is unable to occur for a reason other than a breach or default by Lessee or Lessor, then Lessee shall have the right to rescind the Notice of Exercise, in which case the Deposit shall be returned to Lessee, the Lease shall continue in full force and effect (including Lessee's right to later re-exercise the Purchase Option), and Lessee shall not be liable for any costs incurred by Lessor with respect to the failed Closing; provided, however that each of Lessee and Lessor shall pay one-half of the Escrow Holder's costs and fees in connection with the Option Escrow and its cancellation.

69.8.     Condition of Property. Lessee represents and warrants that Lessee has, or shall have inspected and conducted tests and studies of the Premises, and that Lessee is familiar with the general condition of the Premises. Lessee understands and acknowledges that the Premises may be subject to earthquake, fire, floods, erosion, high water table, dangerous underground soil conditions, hazardous materials and similar occurrences that may alter its condition or affect its suitability for any proposed use. Except as otherwise

14

expressly provided in the Lease, Lessor shall have no responsibility or liability with respect to any such occurrence. Lessee represents and warrants that, except for Lessor's express representations and warranties herein, Lessee is acting, and will act only, upon information obtained by Lessee directly from Lessee's own inspection of the Premises. Lessor hereby makes no claims, representations or warranties as to the suitability or lack of suitability of the Premises for any proposed or intended use, or availability or lack of availability of (a) permits or approvals of governmental or regulatory authorities, or (b) easements, licenses or other rights with respect to any such proposed or intended use of the Premises shall not affect the rights or obligations of the Lessee hereunder.

69.9.    "As Is".  Lessee expressly agrees that if it completes the purchase of the Premises (i) that it is purchasing the Premises on an "As Is" basis and based on its own investigation of the Premises, (ii) that, except as expressly set forth herein, neither Lessor nor Lessor's employees, agents, brokers, representatives, managers, property managers, asset managers, officers, principals, beneficiaries, trustees, attorneys or contractors (collectively, "Lessor's Representatives") have made any warranty, representation or guarantee, expressed, implied or statutory, written or oral, including, without limitation, any implied warranty of merchantability or fitness for any use or purpose or of reasonably workmanship, concerning the Premises or any of the products or improvements located thereon or therein; (iii) that, except as otherwise expressly set forth herein, neither Lessor nor Lessor's Representatives have made any warranty, representation, or guarantee, expressed, implied or statutory, written or oral, pertaining to the Premises' compliance with any laws, ordinances, rules or regulations, federal, state or local and (iv) except as otherwise expressly set forth herein, that neither Lessor nor Lessor's Representatives have made any warranty, representation or guarantee, expressed, implied or statutory, written or oral, as to any government limitation or restriction, or absence thereof, pertaining to the Premises, or as to the presence or absence of any latent defect, subsurface soil condition, environmental condition, hazardous substance, toxic waste or any other matter pertaining to the physical condition (title, mapping, grading, construction, or otherwise) of the Premises.  Lessee is or as of the Close of Purchase Option Escrow will be familiar with the Premises and their suitability for Lessee's intended use.  All documents which have been given to Lessee by Lessor, or Lessor's Representatives, have been delivered as an accommodation to Lessee and without any representation or warranty as to the sufficiency, accuracy, completeness, validity, truthfulness, enforceability, or assignability of any of the documents, all of which Lessee relies on at its own risk.  Lessee acknowledges and agrees that, except as otherwise expressly set forth herein, Lessee's only recourse for any defect in title shall be against the title company and not Lessor.

69.10.  Release.  Lessee shall rely solely upon Lessee's own knowledge of the Premises based on its investigation of the Premises and its own inspection of the Premises in determining the Premises' physical condition.  Effective upon the Close of Escrow, Lessee and anyone claiming by, through or under Lessee hereby waives its right to recover from and fully and irrevocably releases Lessor and its respective members, employees, officers, directors, partners, shareholders, beneficiaries, trustees, fiduciaries, representatives, agents, servants, attorneys, affiliates, parent, subsidiaries, successors and assigns, and all persons, firms, corporations and organizations acting in their behalf ("Released Parties") from any and all claims that it may now have or hereafter acquire against any of the Released Parties for any costs, loss, liability, damage, expenses, demand, action or cause of action arising from or related to any construction defects, errors, omissions or other conditions, latent or otherwise, including environmental matters, affecting the Premises

15

12926447.1

or any portion thereof. This release includes claims of which Lessee is presently unaware or which Lessee does not presently suspect to exist which, if known by Lessee, would materially affect Lessee's release to Lessor. In this connection and to the fullest extent permitted by law, Lessee hereby agrees, represents and warrants that Lessee realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Lessee further agrees, represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that, as a material portion of the consideration given to Lessor by Lessee in exchange for Lessor's performance hereunder, Lessee nevertheless hereby intends to release, discharge and acquit Lessor from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included. Lessor has given Lessee material concessions regarding this transaction in exchange for Lessee agreeing to the provisions of this Section.

69.11. <u>Additional Release</u>. The releases set forth in Section 69.10 above and this Section 69.11 are full and complete releases of all the persons and entities described above of and from any and all liability of any nature whatsoever for all damage, injury, loss, expense, including any consequential expense, loss or damage, whether the same are now known or unknown to the parties, expected or unexpected by said parties, and all rights under Section 1542 of the California Civil Code are hereby waived and relinquished. Section 1542 of the Civil Code provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> THAT THE CREDITOR OR RELEASING PARTY DOES
> NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
> FAVOR AT THE TIME OF EXECUTING THE RELEASE
> AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE
> MATERIALLY AFFECTED HIS OR HER SETTLEMENT
> WITH THE DEBTOR OR RELEASED PARTY."

<u>Lessee's Initials</u>

Notwithstanding anything to the contrary herein, the foregoing releases in Section 69.10 and this Section 69.11 are not intended to and do not cover (i) any claims arising from a breach by Lessor of any Lessor's obligations under this Lease, or (iii) any gross negligence, willful misconduct or fraud committed by Lessor.

69.12. <u>Permissible Title Exceptions</u>. Upon the Close of Purchase Option Escrow, Lessor shall convey the Premises to Lessee by a grant deed (the "Grant Deed"). The Grant Deed shall be subject only to the following (collectively, the "Permitted Exceptions"):

    a)   <u>Current Matters of Record</u>. Those matters of record identified on the attached <u>Exhibit A</u>.

    b)   <u>Lease</u>. This Lease.

    c)   <u>Future Non-Monetary Exceptions</u>. All monetary and non-monetary encumbrances placed against the Premises or which may appear of record after the date hereof as the result of any action or inaction of Lessee (including any

16

monetary encumbrances appearing of record as a result of any action or inaction by Lessee during the Purchase Option Term).

d) <u>Taxes.</u> Non-delinquent general, special and supplemental real property taxes and assessments; provided however, all delinquent taxes and assessments relating to the period following the Commencement Date of the Lease are the responsibility of Lessee pursuant to this Lease and shall be paid by Lessee at Closing.

e) <u>Printed Exceptions.</u> Matters shown as printed exceptions in the standard form of Owner's Policy of Title Insurance.

<u>Title Insurance.</u> Lessor shall cause to be delivered to Lessee upon the Close of Purchase Option Escrow, an ALTA standard coverage owner's policy of title insurance on the Premises issued by Escrow Holder with policy limits equal to the Purchase Price and insuring title to the Premises in the condition set forth above and otherwise vested in Lessee. Lessee shall have the right to request issuance of an ALTA extended coverage owner's policy of title insurance and any endorsements it may require, but the Closing shall not be delayed or conditioned on the issuance of same. Lessee shall obtain, at its sole cost and expense, any survey required to obtain any such extended coverage Title insurance, and the obtaining or failure to obtain any such survey shall not delay the Closing.

69.13. <u>Additional Closing Documents.</u> As part of the Closing, the parties shall execute and deliver the following additional documents to the Escrow Holder:

a) Lessor and Lessee shall execute and deliver an Assignment and Assumption of Lease;

b) Lessor shall execute and deliver a Bill of Sale and General Assignment;

c) Lessor shall execute and deliver a Transferor's Certification of Non-Foreign Status, together with a California Form 593-C, reflecting that no tax withholding is required; and

d) Lessor and Lessee shall deliver such additional, customary escrow closing documents and instruments as Escrow Holder shall reasonably require, including appropriate evidence of authority and a customary owner's affidavit.

The Grant Deed and those documents specified in Paragraphs 69.9 (a), (b) and (c) shall be prepared by Lessor and delivered to Lessee for review and approval not later than ten (10) days prior to the Scheduled Closing Date. The exact form and content of such documents shall be subject to good faith negotiation by Lessor and Lessee and the failure of Lessor and Lessee to agree upon the form of such documents not later than 2 Business Days prior to the Scheduled Closing Date shall constitute the failure of a condition of closing, and either party shall then have the right to terminate the Purchase Option and the sale of the Premises.

69.14. <u>Prorations and Credits.</u> Pursuant to the terms of the Lease, all real property taxes and assessments and utilities are to be paid by Lessee and as such no prorations for the same are to be made.

12926447.1

69.15. <u>Closing Costs</u>.  Lessor shall pay for (a) all premiums for the ALTA standard coverage portion of the Title Policy, (b) one-half (½) of all Escrow fees and costs, (c) all sales and gross receipts taxes, (d) all documentary transfer and/or stamp taxes, if any, and (e) Lessor's share of prorations, if any.  Lessee shall pay for (i) all premiums for the ALTA extended coverage portion of the Title Policy and any endorsements requested by Lessee, (ii) all costs relating to the survey and all reports, studies, inspections, investigations and all other costs and expenses incurred by Lessee in connection with its review of any materials, documents, materials, the Premises and other such due diligence conducted by Lessee, (iii) any document recording fees and charges, (iv) one-half (½) of all Escrow fees and costs, and (v) Lessee's share of prorations, if any.  Lessor and Lessee shall each pay for all of its respective legal and professional fees and fees of other consultants incurred by such respective party, and if Lessee shall finance any of the Purchase Price, Lessee shall pay all costs and expenses incurred or arising in connection with such financing.  All other normal and customary closing costs and expenses shall, except as otherwise herein set forth, be allocated between Lessor and Lessee in accordance with the customary practice in the County in which the Project is situated.

69.16. <u>Purchase Option Assignment</u>.  The Purchase Option is personal to Lessee and may not be assigned in whole or in part at any time.  Notwithstanding the foregoing, Lessee may assign the Purchase Option to any other governmental entity approved by the City to whom this Lease is assigned as set forth in Section 60 herein above.

<u>(remainder of page left intentionally blank)</u>

70.    Counterparts. The Form Lease and Addendum may each be executed in multiple counterparts
and by separate parties on separate counterparts and delivered via facsimile or other means of
electronic image transmission, each of which shall be deemed an original for all purposes, but all
of which, together, shall constitute one and the same instrument.

LESSOR:                                LESSEE:

DYER 18, LLC

By: _____
Name: Ryan Cowdrich
Title: Development

THE CITY OF SANTA ANA

Name:
Title:

# See attached City of Santa Ana
# signature page

**Lessee City of Santa Ana Signature Page to:**

**Addendum to**
**Standard Industrial/Commercial Single-Tenant Lease – Net**
**For Certain Premises Commonly Known as**
**1815 East Carnegie, Santa Ana, California 92705**
**March 1, 2021**

**CITY OF SANTA ANA:**                                      **ATTEST:**

Kristine Ridge                                             Daisy Gomez
City Manager                                               Clerk of the Council

**APPROVED AS TO FORM:**                                   **RECOMMENDED FOR APPROVAL:**
Sonia R. Carvalho
City Attorney

Ryan O. Hodge                                              Steven Mendoza
Assistant City Attorney                                    Executive Director
                                                           Community Development Agency

EXHIBIT "A" -- LIST OF PERMITTED EXCEPTIONS

See attached

20

EXHIBIT "B" – DESCRIPTION OF LESSEE USES

The property will be used as an emergency homeless shelter and ancillary uses thereto are center, health clinic, and ancillary office space. Services to be provided include case management, housing navigation, behavioral health and substance use counseling, healthcare coordination, and job development. Outdoor property perimeter will be covered with screened fences to limit visibility into the area. Outdoor facilities will include client storage area, pet accommodations, smoking area, outdoor common area, recreational area, and temporary modular housing. There will be 24/7 security guard presence at the property to promptly resolve any security issues that may arise. In addition, this property is not a walk-in facility. All client transportation to and from the facilities will be provided. In addition, there is a Good Neighbor Policy which will be implemented by Lessee (and its Third Party Operator) to promote positive communication and relationship with neighbors on an ongoing basis.

21

# EXHIBIT B

1   SONIA R. CARVALHO (SBN 162700)
    CITY ATTORNEY
2   JOHN M. FUNK (204605)
    ASSISTANT CITY ATTORNEY
3   CITY OF SANTA ANA
    20 CIVIC CENTER PLAZA M-29
4   P.O. BOX 1988
    SANTA ANA, CALIFORNIA  92702
5   TELEPHONE:  (714) 647-5201
    FACSIMILE:   (714) 647-6515
6   EMAIL:  jfunk@santa-ana.org

7

8   Attorneys for Defendant and Cross-Claimant
    CITY OF SANTA ANA
9

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                  SOUTHERN DIVISION

13

14

| | |
|---|---|
| 15  ORANGE COUNTY CATHOLIC | Case No.: SACV 18-0155-DOC (JDE) |
| 16  WORKER, an unincorporated | |
|     association; Lisa Bell, Shawn Carroll, | **SETTLEMENT AGREEMENT BY** |
| 17  Melissa Fields, Larry Ford, Cameron | **AND BETWEEN THE CITY OF** |
|     Ralston, Kathy Schuler, Gloria | **SANTA ANA AND THE ORANGE** |
| 18  Shoemake, as individuals, | **COUNTY CATHOLIC WORKER** |
| 19 | |
| 20          Plaintiffs, | |
| 21      v. | |
| 22  ORANGE COUNTY, the City of | |
|     Anaheim, the City of Costa Mesa, the | |
| 23  City of Orange, et al. | |
| 24 | |
|     Defendants. | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

1

| | |
|---|---|
| City of Santa Ana, | ) |
| | ) |
| Cross-Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| County of Orange, City of Aliso Viejo, | ) |
| City of Anaheim, City of Brea, City of | ) |
| Buena Park, City of Costa Mesa, City of | ) |
| Cypress, City of Dana Point, City of | ) |
| Fountain Valley, City of Fullerton, City of | ) |
| Garden Grove, City of Huntington Beach, | ) |
| City of Irvine, City of La Habra, City of | ) |
| La Palma, City of Laguna Beach, City of | ) |
| Laguna Hills, City of Laguna Niguel, City | ) |
| of Laguna Woods, City of Lake Forest, | ) |
| City of Los Alamitos, City of Mission | ) |
| Viejo, City of Newport Beach, City of | ) |
| Orange, City of Placentia, City of Rancho | ) |
| Santa Margarita, City of San Clemente, | ) |
| City of San Juan Capistrano, City of Seal | ) |
| Beach, City of Stanton, City of Tustin, | ) |
| City of Villa Park, City of Westminster | ) |
| and City of Yorba Linda, | ) |
| | ) |
| Cross-Defendants. | ) |
| | ) |

## **SETTLEMENT AGREEMENT**

This Settlement Agreement ("Agreement") is entered into by and between Defendant and Cross-Claimant City of Santa Ana ("City"), and Plaintiff Orange County Catholic Worker ("OCCW"), an unincorporated association acting by and through its designated representatives.

The parties to this Agreement are referred to herein individually as a "Party" and collectively as the "Parties."

2

## RECITALS

A.      WHEREAS, on January 29, 2018, OCCW and certain individual plaintiffs filed an action, entitled *Orange County Catholic Worker et al. v. Orange County et al.*, United States District Court, Central District of California, Case No. 8:18-cv-00155-DOC-KES ("OC Catholic Worker Action"), against the County of Orange ("County"), the City of Anaheim, the City of Costa Mesa, and the City of Orange.

B.      WHEREAS, on March 17, 2018, the City of Santa Ana intervened in the OC Catholic Worker Action as a defendant.

C.      WHEREAS, on April 26, 2018, the City of Santa Ana filed a cross-complaint in the OC Catholic Worker Action against the County and all other cities in the County, alleging violations of the: (1) Eighth Amendment (cruel and unusual punishment); (2) Fourteenth Amendment (equal protection); and (3) Fourteenth Amendment (due process) ("Cross-Complaint").  The Cross-Complaint was served on the County, the City of Anaheim, the City of Orange, and the City of Tustin. The Cross-Complaint remains unserved on all other cross-defendants.

D.      WHEREAS, on July 26, 2018, OCCW filed a First Amended Complaint ("OCCW FAC"), which, among other changes, pleaded a potential class action against the County.  At the time of execution of this Agreement, the OCCW FAC is the operative complaint in the OC Catholic Worker Action.

E.      WHEREAS, on November 13, 2018, OCCW filed a Supplemental Complaint adding the City of Tustin as a defendant.

F.      WHEREAS, on June 28, 2019, OCCW filed a Supplemental Complaint adding the cities of Brea, Buena Park, Cypress, Fullerton, La Habra, La Palma, Los Alamitos, Placentia, Stanton, Villa Park, and Yorba Linda as defendants ("North SPA Cities").

G.      WHEREAS, the OCCW FAC as well as the Supplemental Complaints, alleges that OCCW is an unincorporated association dedicated to the

3

service and care of the poor in Orange County, and that the individual OCCW plaintiffs are homeless individuals residing in Orange County. The OCCW FAC alleges, inter alia, that defendants, and each of them, have violated the OCCW plaintiffs' rights by enforcing various laws against them, including trespass, loitering, and/or anti-camping ordinances, at times when, according to the OCCW plaintiffs, there were no immediately accessible and appropriate beds available to them in Orange County. The City of Santa Ana disputes the factual allegations and legal contentions made by OCCW in the OCCW FAC.

H.     WHEREAS, the OCCW FAC includes the following causes of action against the City of Santa Ana as well as other defendants: (1) violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, and Article VII, section 17 of the California Constitution for alleged "cruel and unusual punishment"; (2) violation of the First and Fourth Amendments to the U.S. Constitution; (3) violation of the right to due process of law under the Fourteenth Amendment to the U.S. Constitution; (4) violation of California Civil Code section 52.1; (5) violation of California Government Code section 815.6; and (6) violation of California Government Code section 11135. Defendant City of Santa Ana disputes each and every claim for relief in the OCCW FAC in its entirety and disputes OCCW's underlying legal contentions and theories.

I.     WHEREAS, the Cities of Anaheim, Costa Mesa, Orange, and Tustin have each entered into separate settlement agreements with OCCW, all of which have been approved by the Court.

J.     WHEREAS, the North SPA Cities have collectively entered into a settlement agreement with OCCW that has been approved by the Court.

K.     WHEREAS, the City of Santa Ana has voluntarily dismissed all those parties to the Cross-Complaint that were served such that the County remains the sole cross-defendant that has been served with the Cross-Complaint.

4

L.      WHEREAS, without admitting any wrongdoing, liability, or legal violations on the part of the City of Santa Ana, without conceding the validity of any of the OCCW's legal theories or claims, and for the sole purpose of preemptively, economically, and efficiently resolving the OC Catholic Worker Action as to the City of Santa Ana, the Parties now desire to enter into this Agreement on the terms set forth herein.

## TERMS

NOW, THEREFORE, for full and valuable consideration, the sufficiency of which is hereby acknowledged, and based upon the foregoing Recitals, and the terms, conditions, covenants, and agreements herein, the Parties agree as follows:

**1.      Order re Continuing Jurisdiction and Effective Date**

Following the full execution of this Agreement by all Parties, the Parties shall file with the Court in the OC Catholic Worker Action proposed orders regarding settlement and continuing jurisdiction and incorporating the terms of this Agreement.  Except for the obligations of the City in Section 3, the obligations of the Parties in the remaining sections of this Agreement, and the releases contained herein, shall become effective and operative on the date(s) on which the respective order is fully executed and entered by the Court ("Effective Date"), and shall be contingent upon the Court's signing and entry of the respective order.  The obligations of the City in Section 3 shall become effective and operative only upon the Court's approval of a separate settlement agreement between the City and County as to the City's Cross-Complaint, including but not limited to the subjects of a replacement site for the County-operated shelter known as the "The Courtyard" and the parties' obligations under a related Memorandum of Understanding currently in effect between them.  This Agreement shall be in effect for three (3) years following the Effective Date and then shall terminate.

**2.      Incorporation of Recitals**

The representations in the above-section of this Agreement, entitled "Recitals," are hereby incorporated into and made a material part of the terms and representations of this Agreement.

**3.      Construction and Operation of Shelters**

3.1      At the time of this Agreement, the City operates a temporary, low-barrier shelter in the City with a capacity of 200 beds, known as "The Link."

3.2      The City shall fund, obtain funding for, and/or coordinate third-party funding for, the construction and operation of an additional low-barrier homeless shelter at a different location within the boundaries of the City, with capacity of 200 beds, expandable to 250 beds ("Additional Shelter"). The City shall have complete discretion in determining which Additional Shelter to fund and which shelter project may be feasible, subject to any limitations set forth herein. The City's funding commitment for the Additional Shelter shall be for three (3) years, beginning on the Effective Date.

3.3      There will be an overlap period of time during which The Link and the Additional Shelter will operate concurrently such that the total number of beds during this time will be up to 450. Any remaining number of beds that may be necessary to satisfy the City's obligations under Section 3 of this Agreement shall be addressed in the context of a separate settlement agreement between the City and County as to the City's Cross-Complaint.

3.4      The City shall require that the Link and the Additional Shelter be operated on a non-religious basis, but not exclude religious organizations from operating, and in full compliance with all applicable state and federal antidiscrimination laws, including but not limited to, California Government Code section 11135 and the Americans with Disabilities Act, 42 U.S.C. section 12101 et seq.

3.5     Although the above-referenced shelters are not the exclusive means by which the City may satisfy its obligation to meet the needs of homeless individuals in the City, OCCW Plaintiffs acknowledge and agree that the creation and operation of The Link and the Additional Shelter, or a number of placements equal to The Link and the Additional Shelter, shall satisfy the City's obligations under Section 3 of the Agreement, as well as any other requirement by the Court pertaining to the number of available beds for the unsheltered individuals in the City.

4.     **Enforcement of Anti-Camping Ordinances**

4.1     The City shall establish the following policies and procedures relating to the enforcement of Santa Ana Municipal Code sections 10-400 to 10-403 and 10-550-551 ("Anti-Camping Ordinances"), curfews including park hours, or any comparable provisions of state law, or any law concerning "loitering" against homeless individuals within its jurisdictions. This shall apply to the City and its agents including but not limited to private security:

4.1.1   Absent exigent circumstances, any enforcement of the Anti-Camping Ordinances against a homeless individual (including any of the Individual OCCW Plaintiffs) will first be preceded by contacts from outreach and engagement personnel to determine an available and appropriate placement for the individual in question, per the procedures outlined herein.  For purposes of this Agreement, "outreach and engagement personnel" may include County Outreach and Engagement Personnel, representatives from CityNet, City employees, the homeless liaison, police officers, and any other organizations with which the City has contracted for such outreach and engagement services (collectively, "O&E Personnel") who are trained in engaging in appropriate clinical assessments of individuals with disabilities to determine an appropriate placement.

4.1.2   In implementation of Section 4.1.1, prior to enforcement of the Anti-Camping Ordinances against any homeless individual, O&E Personnel

7

will locate and offer an available and appropriate placement in the City for the individual in question.

     4.1.3  If the individual declines the offered placement, the City may proceed with enforcement of the Anti-Camping Ordinances in its sole discretion subject to the dispute resolution process detailed herein.

     4.1.4  If the alleged violation arises from an individual's presence in a park outside of the established operational hours of the park, and if there is no appropriate and immediately available placement for that person, the City will advise the individual that they must leave the park and move to any public area outside of the park.  If the person does not leave the park after receiving this warning, the City may issue a citation to the individual.

     4.1.5  The requirements of this Section 4.1 shall only apply until the earlier of: (a) the date on which the case of *Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018) ("*Martin v. Boise*") is no longer applicable law within the jurisdiction of the Ninth Circuit or (b) the date on which the Court finds that there are sufficient appropriate and immediately available placements for the unsheltered homeless population in the City.

    4.2 Nothing in this Agreement constitutes an admission by the City that its current policies and procedures for enforcement of the Anti-Camping Ordinances are either: (a) different from those set forth above or (b) in any way legally inadequate, or a concession by the OCCW Plaintiffs that they are legally adequate.

    4.3 Nothing in this Agreement constitutes a promise, representation, or warranty, on the part of the City, that any number of beds will be available to any particular person(s) at any time.  The lack of availability of an appropriate and immediately accessible bed for any person or persons at any time, including any of the individual OCCW plaintiffs, may impact the ability of the City to punish a purported violation of the Anti-Camping Ordinances.

4.4.    Absent exigent circumstances, the City shall not cite or arrest any homeless individual for violation of the law based on an alleged obstruction of public property unless that individual, either individually or in conjunction with his or her property, actually obstructs free passage of any person or vehicle on any public highway, alley, sidewalk, or crosswalk and declines to move the object(s) creating obstruction from the public right of way after being requested to do so, or actually obstructs with access to a public highway, alley, sidewalk, or crosswalk for sanitation, cleaning, or routine maintenance or repair purposes and declines to cease the obstruction after being requested to do so.

4.5    Nothing in this Agreement shall impact the authority of the City to enforce any law not based on an individual's unsheltered status against a person believed to be homeless, including issuing and arresting the person for an alleged violation of law.

## 5.    <u>Dispute-Resolution Process</u>

The Court shall retain jurisdiction over the OC Catholic Worker Action for a period of three years from the Effective Date for the purposes of (a) overseeing the implementation of this Agreement, and (b) implementing and presiding over the a dispute-resolution process (the "Dispute-Resolution Process") to be established by the Court and to which Plaintiffs and the City hereby consent and agree:

5.1    Except as expressly identified in this Agreement, or as may be modified by the Court or the Parties, with the Court's consent, during the three-year period of the Court's continued jurisdiction, this Dispute-Resolution Process shall apply to adjudicate any and all disputes between, on the one hand, the City, and, on the other hand, any homeless individual or individuals who consent, at the time of requesting the Dispute-Resolution Process, to be bound by the Dispute-Resolution Process and the provisions of this Agreement applicable to the OCCW Plaintiffs (including but not limited to the individual OCCW plaintiffs), relating to (a) the implementation of this Agreement, and/or (b) the enforcement of the above-

9

identified Municipal Code sections, or other laws applied against any homeless person arising out of that individual's homeless status, including but not limited to disputes regarding the availability or adequacy of any shelter or shelter services offered to the individual pursuant to Section 4.1 of this Agreement and expressly excluding violations of law relating to conduct not arising from the individual's homeless status (examples include but are not limited to possession of illegal substances or weapons, trespass on private property, acts of violence, public intoxication, etc.) (collectively, the "Disputes," and individually, a "Dispute").

5.2    In the event of any Dispute arising during the pendency of the Court's retained jurisdiction, the parties to that Dispute will first attempt to meet and confer informally with the other side in an effort to resolve it.  In the case of a Dispute raised by one or more homeless individuals against the City, or a Dispute raised by the City against one or more homeless individuals, including any such persons who are known to be, or the City is advised are, represented by counsel of record in the OC Catholic Worker Action, this attempt will at least involve (a) a written communication from the party initiating the Dispute to the other side's counsel describing in detail the Dispute and the requested remedy, and providing any available evidence in relation thereto, and (b) a discussion, either in person or via telephone, seeking to resolve the Dispute.  In the event the City receives a complaint from a homeless individual, City employees, as well as the employees of any City shelter facility, shall give any affected individual notice of the Court's Dispute-Resolution Process and the contact information for applicable legal services organizations, including the law center associated with Plaintiffs' counsel, together with a statement that such entities may be available to assist them.

5.3    If the parties to a Dispute are unable to resolve it within two (2) court days after it is first raised informally by one of the parties to the Dispute, any party to the Dispute may request a hearing with the Court under the standards and

processes to be set by the Court, and the Court will have jurisdiction to resolve that Dispute.  If the Dispute involves an emergency situation that presents a threat to the immediate health and safety of an individual, the parties may seek expedited review by the Court.

5.4     The fact that a person has initiated the Dispute-Resolution Process shall not impact the City right to enforce any law against that person, including issuing citations to the person, concurrently with the Dispute-Resolution Process.  However, the City agrees that no custodial arrest will be made for a violation of the anti-camping, loitering, and similar laws arising from an individual's status as homeless prior to the exhaustion of the Dispute-Resolution Process with the Court pursuant to Section 5.3 of this Agreement.  In circumstances involving citation, the Court may issue an order directing the City to stay the filing of formal charges against the homeless individual until the Dispute-Resolution Process has been completed for that Dispute.  The City agrees not to contest such a request for a brief stay of the filing of charges.  Once the Dispute-Resolution Process has concluded regarding an issue, the City will not be required to await exhaustion of the Dispute-Resolution Process regarding the same issue and the same individual prior to a custodial arrest where the individual does not comply with a warning or leave once a citation has been issued, provided the City complies with the Court's determination of that same issue for that same individual.  For purposes of the Section 5.4, "same issue" refers to an issue determined by the Court in the Dispute-Resolution Process where the individual's objections, including any claim of alleged disability, physical limitations and the offered placement are substantially similar for purposes of determining whether the individual's disability or other objection is being reasonably accommodated.

5.5     In resolving any Dispute, the Court may enforce any rights available to a party under this Agreement, subject to sufficient notice, opportunity to

11

be heard, briefing, evidence, and other due process. The Court shall not be empowered to award damages or any other monetary relief to any party as a result of any Dispute submitted to this process. Nothing in this Agreement limits the ability of any Plaintiff to seek damages in other proceedings not subject to this Agreement.

5.6    Should either party disagree with the Court's determination resulting from the Dispute-Resolution Process, nothing in this Agreement shall preclude either party from commencing litigation concerning the subject of said Dispute, and pursuing any remedies available at law; provided that in advance of initiating such action, the parties shall first engage in an in-person meet-and-confer to occur within seven (7) calendar days of a request from the other party.

**6.    Release and Covenant Not to Sue**

6.1    In consideration for the terms of this Agreement, OCCW Plaintiffs, and each of them, and any other individual claiming rights under this Agreement (the "OCCW Releasing Parties"), hereby release and forever discharge the City of Santa Ana, as well as its present and former employees, agents, managers, officers, directors, councilmembers, insurance companies, attorneys, departments, and divisions or affiliated entities, whether previously or hereafter affiliated in any manner (the "City Released Parties"), from and against any and all claims, demands, causes of action, obligations, damages, attorney's fees, costs, and liabilities, arising from or relating to the events detailed in the lawsuit of any nature whatsoever, whether or not now known, suspected, or claimed, which the OCCW Releasing Parties, and/or any of them, have, or ever may claim to have, as against the City Released Parties, or any of them, whether directly or indirectly, relating to, or arising out of the: (a) OC Catholic Worker Action; (b) any claims raised in, or that could been raised in, the OC Catholic Worker Action; (c) the availability of homeless shelters, shelter beds, and/or other homeless accommodations in the City of Santa Ana; (d) the City's alleged obligation to provide or fund such

12

accommodations; and/or (e) the City's alleged inability to enforce any of the Anti-Camping Ordinances and any law that the OCCW Releasing Parties claim criminalizes a person's homeless status, against any person because of his or her homeless status (collectively, the "OCCW Released Claims").

6.2    The releases set forth in Section 6.1 are releases of all claims, demands, causes of action, obligations, damages, and liabilities, of any nature whatsoever, and are intended to encompass all known and unknown, foreseen and unforeseen, claims that are possessed by the OCCW Releasing Parties and within the scope of the OCCW Released Claims based solely and only on the events giving rise to the OC Catholic Worker Action. To effectuate the intent of the Parties, the OCCW Releasing Parties expressly agree to waive and relinquish all rights and benefits they may have under California Civil Code Section 1542, which reads as follows:

A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

6.3    The OCCW Releasing Parties warrant that they have made no assignment, and will make no assignment, of any claim, chose in action, right of action, or any right, of any kind whatsoever, within the scope of the OCCW Released Claims, and that no other person or entity of any kind had or has any interest in any of the demands, obligations, actions, causes of action, debts, liabilities, rights, contracts, damages, attorney's fees, costs, expenses, losses, or claims within the scope of the OCCW Released Claims.

## 7.    **Dismissal of the OC Catholic Worker Action**

Upon entry of the Court's Order re Continuing Jurisdiction and Settlement, the OCCW Plaintiffs, as to the City, will take all necessary actions and file all

necessary documents to effectuate dismissal of the OC Catholic Worker Action
with prejudice.

**8.**     **Settlement Payments and Attorney's Fees**

All Parties to this Agreement shall bear their own costs, expenses, and
attorney's fees in relation to or arising out of: (a) the OC Catholic Worker Action;
(b) the resolution, negotiation, and settlement of the OC Catholic Worker Action,
including the negotiation of this Agreement; and (c) the implementation of this
Agreement.

**9.**     **Non-Admission of Liability**

By entering into this Agreement, the City does not admit any liability, and
explicitly denies any liability or wrongdoing of any kind arising out of or relating
to any of the claims alleged in the OC Catholic Worker Action. Nothing herein
constitutes an admission by the City as to any interpretation of laws, or as to the
merits, validity, or accuracy of any of the claims or legal contentions made in the
OC Catholic Worker Action. The City has entered into this Agreement solely to
avoid the time, expense, and risk of continued litigation. The Parties agree that an
express condition of this settlement is that there has been no finding of liability on
the merits, and that this settlement and any document related to this settlement,
including this Agreement and any related orders, and the negotiations leading up to
this settlement, shall be inadmissible in evidence and shall not be used for any
purpose in this or any other proceeding, except in an action or proceeding to
approve, interpret, or enforce this Agreement.

**10.**     **Knowing and Voluntary**

This Agreement is an important legal document that has been voluntarily
and knowingly executed by the Parties. The Parties, and each of them, specifically
represent that, prior to signing this Agreement: (a) they have each been provided a
reasonable period of time within which to consider whether to accept this
Agreement; (b) they have each carefully read and fully understand all of the

14

provisions of this Agreement; and (c) they are voluntarily, knowingly, and without coercion entering into this Agreement based upon their own judgment.  The OCCW Plaintiffs and City further specifically represent that, prior to signing this Agreement, they have conferred with counsel of their choice to the extent desired concerning the legal effect of this Agreement, and that the legal effect of this Agreement has been adequately explained to them.

## 11.   **Entire Agreement**

This Agreement constitutes the entire agreement by and between the OCCW Releasing Parties and the City Released Parties regarding the matters discussed herein, and supersedes any and all other agreements, understandings, negotiations, or discussions, either oral or in writing, express or implied, between the OCCW Releasing Parties and the City Released Parties relating to the subject matter hereof.  The OCCW Releasing Parties and the City Released Parties each acknowledge that no representations, inducements, promises, agreements, or warranties, oral or otherwise, have been made by them, or anyone acting on their behalf, which are not embodied in this Agreement, that they have not executed this Agreement in reliance on any such representation, inducement, promise, agreement, or warranty, and that no representation, inducement, promise, agreement, or warranty not contained in this Agreement, including but not limited to, any purported supplements, modifications, waivers, or terminations of this Agreement, shall be valid or binding, unless executed in writing by all of the Parties to this Agreement.  Any alteration, change, or modification of or to this Agreement shall be made by written instrument executed by each Party in order to become effective.

## 12.   **Warranty of Authority**

Each individual or entity that executes this Agreement represents and warrants, in his, her or its personal capacity, that he, she, or it is duly authorized

15

1   and empowered to enter into this Agreement on behalf of the party it purports to

2   represent.

3        **13.**   **Counterparts**

4          This Agreement may be executed in multiple counterparts, each of which

5   shall be considered an original but all of which shall constitute one agreement.

6        **14.**   **No Waiver of Terms of Agreement**

7          The failure to insist upon compliance with any term, covenant, or condition

8   contained in this Agreement shall not be deemed a waiver of that term, covenant,

9   or condition, nor shall any waiver or relinquishment of any right or power

10   contained in this Agreement at any one time or more times be deemed a waiver or

11   relinquishment of any right or power at other time or times.

12        **15.**   **Modification of Agreement**

13          The enforcement terms of this Agreement may be vacated or modified, at the

14   request of any Party hereto, if: (a) the holding of *Martin v. Boise* is reversed or

15   modified, or is otherwise no longer good law; (b) the Court determines that the

16   number of available and appropriate shelter placements in the City warrants

17   termination or modification of the Agreement; or (c) upon petition by the City, the

18   Court determines that other terms of the Agreement have been met.

19

20          IN WITNESS WHEREOF, this Settlement Agreement is hereby entered into

21   and executed by the parties hereto on the dates set forth below.

22

23

24                          OC CATHOLIC WORKER

25

26   Dated: *Sept. 23* , 2019       By:  Orange County Catholic Worker

27                                 by Carol Sobel

28

1  APPROVED AS TO FORM

2

3  [signature]

4  Carol A. Sobel
   Attorneys for Plaintiffs
5

6  APPROVED AS TO FORM

7

8  [signature]

9  Brooke Weitzman
   Attorneys for Plaintiffs
10

11                                              CITY OF SANTA ANA

12

13  Dated: _9/23_, 2019        By: _____[signature]_____

14                                              Kristine Ridge
                                                City Manager
15

16  APPROVED AS TO FORM

17

18  [signature]

19  John M. Funk
    Assistant City Attorney
20

21  ATTEST

22

23  _____

24  Daisy Gomez
    Clerk of the Council
25

26

27

28

                              17